26 A.3d 979

**Amardo Annier ATKINS**

v.

**STATE of Maryland.**

**No. 110, Sept. Term, 2010.**

Court of Appeals of Maryland.

Aug. 18, 2011.

**436**

Kelly Knepper–Stephens (George Washington University Community Law Clinics), Washington, D.C., for petitioner.

Jessica V. Carter, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

Petitioner, Armardo Annier Atkins (Atkins), was convicted, in the Circuit Court for Montgomery County, of three counts of Second Degree Assault. Before this Court, Petitioner argues that the trial judge abused her discretion by instructing the jury that the State was not required to shoulder its burden of persuasion by the use of certain categories of demonstrative, i.e. forensic, evidence. Specifically, Petitioner presented one question for our review:

> Whether an instruction that the State need not use certain investigative and scientific techniques violated the Sixth and Fourteenth Amendments and the Maryland Declaration of Rights by undermining the defense's legitimate strategy and bolstering the State's case?

On this record, we shall answer the question in the affirmative. We hold that the trial judge's instruction to the jury on what the State was required to prove, in effect, relieved the State of its burden to prove guilt beyond a reasonable doubt. The investigative or scientific techniques instruction, as framed, was improper because it resulted in a non-neutral commentary on the evidence, or the absence of evidence, actually admitted, and invaded the province of the jury, thus violating Atkins's constitutional rights to due process and a fair trial. This conclusion, however, is based on the particular

facts in this case, and we do not hold that an investigative or scientific techniques instruction would be improper under different circumstances,[1] so long as the State is properly held to its burden, and the instruction regarding what the State must introduce in proving its case is properly related to the reasonable doubt standard.

## FACTS AND PROCEDURE

On November 24, 2007, Petitioner's neighbor, Wesley Waterton, was entertaining a group of people in the basement of his home in Silver Spring. The group included Tiara Barrett and Alexis and Dominique Davis, twin sisters. Atkins and Ms. Barrett had a verbal disagreement, and Barrett phoned her ex-boyfriend, Michael Holland, to come pick her up from the party. The following sequence of events after Mr. Holland arrived is unclear because the witnesses gave inconsistent testimony during trial. What is clear, however, is that after Mr. Holland arrived, a physical altercation errupted involving the Davis sisters, Holland and Atkins. The victims, in varied stories, claimed that Atkins began shoving the women, and then Alexis Davis punched Atkins in the nose, breaking it. Then, Holland tried to break up the fight and Atkins stabbed Holland, and cut both Davis sisters. A witness, Adrian Nightingale, testified that he saw Atkins reach into his pocket and apparently remove something, which Nightingale was unable to describe. Although Nightingale did not see a knife, Nightingale testified that after he saw Atkins reach into his pocket, Holland held his side and fell to the ground.

Atkins, however, testified that once he was outside the Waterton home, Holland yelled at him and pushed him, and then Holland held Atkins from behind while the sisters

---

1. We defer to the Maryland Criminal Pattern Jury Instruction Committee to draft a model jury instruction regarding this Point. In crafting the pattern instruction, the Committee should take into consideration the need for the instruction to be neutral in light of the State's burden to prove its case beyond a reasonable doubt, and consistent with the rules of evidence, to allow the State the discretion to pick and choose the evidence to introduce in establishing its case in chief.

punched and kicked him. Atkins testified that he then re-
moved his pocketknife from his pocket and opened it, and
started swinging the knife in self defense, cutting Holland and
the Davis sisters.[2] Atkins testified that after the fight, he left
the Waterton home and threw his pocketknife in the pond
behind the building. Atkins then returned to his own home,
and his father took him to the hospital to have his injuries
treated. After treatment, Atkins's father took him to the
police station where Atkins gave a voluntary statement.

Three days later, police executed a search warrant for
Atkins's home. Police removed a knife from Atkins's bed-
room, which was contained in a box on top of a bed side table.
The knife was a non-foldable black knife, approximately 12
inches in length overall with a 6 inch blade.[3] Police, however,
did not perform any scientific or forensic testing on the knife
and there was no testimonial evidence from witnesses linking
the particular knife found in Atkins's home to the crime. At
trial, the State argued that the knife found in Atkins's home
was the knife used to inflict the injuries on Holland and the
Davis sisters.[4] In contrast, defense counsel argued that the
knife found was not the knife used in the incident, but instead
maintained that Atkins used a foldable pocketknife to protect

---

2. Both Davis sisters sustained minor injuries and Holland was treated
for severe stab wounds.

3. At oral argument before this Court, Petitioner's counsel described the
knife removed from Atkins's room as a "Rambo-type" knife, and the
State did not object to that characterization of the knife placed into
evidence.

4. In opening statement, the State told the jury that "you're going to
hear testimony that the police executed a search warrant at Amardo
Atkins's house, and they located the knife that he used to stab the three
unarmed individuals. They located that knife hidden in his bedroom."
When defense counsel objected to the admission of the knife, counsel
for both parties approached the bench. Outside the hearing of the jury,
the State argued to the judge that the knife was "the only knife found in
the room. He fled the scene. A surgeon will testify these were deep
wounds" and further, "if [the defense] wants to argue that this isn't the
knife, that it was some other knife, they can argue it, but this is the
evidence." The State concluded that the injuries sustained were "con-
sistent with the knife that was used."

himself. Although defense counsel objected to the admission of the large black knife at trial, the trial judge allowed the State to present the knife as evidence of the crime. On cross-examination of the police officer who found the knife at issue in Atkins's home, defense counsel questioned whether forensic testing could have been done on the knife introduced into evidence, highlighting the lack of evidence connecting the knife to the crime:

> Defense Counsel: Detective, is there any blood on the knife?
>
> Detective Parzych: Can I see it again?
>
> Defense Counsel: You can tell by looking?
>
> Detective Parzych: Well, you asked me a question.
>
> State's Counsel: Objection. Is that a question or a rhetorical—
>
> Defense Counsel: Yes, it is a question. Didn't you look at it before today?
>
> Detective Parzych: Yes, I did.
>
> Defense Counsel: Okay. You didn't see any blood on it back then, right?
>
> Detective Parzych: No, I did not.
>
> Defense Counsel: Or anything that appeared to be blood?
>
> Detective Parzych: No.
>
> Defense Counsel: All right. Is there any ... [a]re there any skin cells on there that might be invisible to the naked eye?
>
> Detective Parzych: I'm not qualified to answer if there are skin cells on there.
>
> Defense Counsel: Okay. All right. But there are people in the police department who are capable of looking for that kind of evidence, right?
>
> Detective Parzych: Correct.
>
> Defense Counsel: Okay. And, so, who looked for that?
>
> Detective Parzych: I don't know.
>
> Defense Counsel: Okay. You asked people in the police department to look for trace evidence before, right?

Detective Parzych: Correct.

Defense Counsel: And you do that by filling out a form and submitting it to the Montgomery County Crime Lab, right?

Detective Parzych: Correct.

Defense Counsel: Okay. Did you do that with respect to any evidence?

Detective Parzych: No, I did not.

Defense Counsel: Do you know if anyone else did?

Detective Parzych: I don't.

Defense Counsel: Okay. But you're aware, aren't you, based on your experience, that the crime lab sometimes can detect fluids such as blood, or saliva, or things like that, skin cells, even when they're invisible to the naked eye, right?

Detective Parzych: Correct.

After the close of evidence but before closing arguments, the State requested the following instruction, which the trial judge gave over defense counsel's objection [5]:

> During this trial, you have heard testimony of witnesses and may hear argument of counsel that the State did not utilize a specific investigative technique or scientific test. You may consider these facts in deciding whether the State has met its burden of proof. You should consider all of the evidence or lack of evidence in deciding whether the defendant is guilty. **However, I instruct you that there is no legal**

---

5. Defense counsel objected to the court giving the investigative and scientific techniques instruction on the basis that the knife introduced into evidence was not used in the affray and that the "pattern jury instructions significantly cover[ed] this when they say that, the State is not required to prove [guilt] to a mathematic certainty or beyond all doubt. So I think it's sufficiently covered by a pattern jury instruction and we would object to that instruction being given." The State countered that the issue was raised on cross-examination and that the pattern jury instructions did not adequately cover the issue. After reviewing *Evans v. State*, 174 Md.App. 549, 922 A.2d 620 (2007), *cert. denied, Evans v. State*, 400 Md. 648, 929 A.2d 890 (2007), the trial judge overruled the objection, stating that the "question could [ ] bear in the mind of the jurors."

**requirement that the State utilize any specific investigative technique or scientific test to prove its case.** Your responsibility as jurors is to determine whether the State has proven based upon the evidence the defendant's guilt beyond a reasonable doubt.

(Emphasis added.) Finally, in its closing, the State argued, "[This case is] about a knife and deadly force. This case is not about young people out there pushing and shoving each other. This is about a knife." Counsel for the State then sought to discredit the Defense's version of events, demonstrating that "[Atkins] is on the ground and he is reaching for his pocket knife, not that knife, a little pocket knife. And the reason why, ladies and gentleman, it's a pocket knife is because a pocket knife doesn't sound that scary." The State then called the defendant's testimony "absurd" and stated again that a pocket knife, "doesn't sound very alarming, it doesn't sound very scary. But this [the large black knife], the one that he said he bought from a friend, now that's a different story, okay?" The State emphasized the knife repeatedly, arguing that "all of us agree here that it is the knife that makes this case serious."

After deliberation, the jury found Atkins guilty on all three counts of assault. Atkins appealed to the Court of Special Appeals, arguing that the trial judge abused his discretion in giving the above jury instruction. Atkins claimed that the judge "improperly commented on the evidence [and] directly contradict[ed] an appropriate defense argument." In an unreported opinion, the Court of Special Appeals affirmed the convictions, relying on its prior decision in *Evans v. State*, 174 Md.App. 549, 922 A.2d 620 (2007), which upheld a similar instruction. The intermediate appellate court, in the present case, stated that the instruction "was a correct statement of the law, applicable to the facts, and not fairly covered by the other instructions given." Atkins filed for *certiorari* and we granted the petition. *Atkins v. State*, 417 Md. 384, 10 A.3d 199 (2010). For reasons stated in this opinion, we shall reverse the judgment of the Court of Special Appeals.

## DISCUSSION

 "The right to trial by jury is guaranteed by the Maryland Declaration of Rights and the Maryland Rules, as well as the United States Constitution." *Stokes v. State,* 379 Md. 618, 626, 843 A.2d 64, 68 (2004) (referencing Articles 5, 21, 23, and 24 of the Maryland Declaration of Rights and Constitution of the United States, Amendments VI and XIV). Further, a defendant has the right to be tried by a fair and impartial jury, Md. Dec. of Rts. Art. 21, and the "jury is the exclusive judge of the fact[s]" in a case. *Gore v. State,* 309 Md. 203, 210, 522 A.2d 1338, 1341 (1987) (citing Md. Dec. of Rts. Art. 23). In order to aid the jury in its deliberations, a trial judge will instruct the jury as to the relevant law in a case. *Chambers v. State,* 337 Md. 44, 48, 650 A.2d 727, 729 (1994). Importantly, "the appellate courts of this State have often recognized error in the trial judge's instructions ... if the error was likely to unduly influence the jury and thereby deprive the defendant of a fair trial." *State v. Hutchinson,* 287 Md. 198, 205, 411 A.2d 1035, 1039 (1980). Thus, it is improper for a trial judge to "comment on a question of fact which the jury is to pass on" because such commentary invades the province of the jury. *Gore,* 309 Md. at 213, 522 A.2d at 1343 (quoting *Coffin v. Brown,* 94 Md. 190, 202–203, 50 A. 567, 572 (1901)). Further, we preclude any instruction "when [it] operate[s], ultimately, to relieve the State of its burden of persuasion in a criminal case, *i.e.,* its burden of proving beyond a reasonable doubt all the facts necessary to constitute the offense." *State v. Evans,* 278 Md. 197, 207, 362 A.2d 629, 635 (1976).

 Maryland Rule 4–325 governs the procedure a court must follow when giving instructions to the jury. Rule 4–325(c) states:

**How given.** The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not

grant a requested instruction if the matter is fairly covered by instructions actually given.

Rule 4–325(c) "requir[es] the trial court to give a requested instruction under the following circumstances: (1) the requested instruction is a correct statement of the law; (2) the requested instruction is applicable under the facts of the case; and (3) the content of the requested instruction was not fairly covered elsewhere in the jury instruction actually given." *Thompson v. State,* 393 Md. 291, 302–303, 901 A.2d 208, 214 (2006) (quoting *Ware v. State,* 348 Md. 19, 58, 702 A.2d 699, 718 (1997)). The rule reflects our view that the "main purpose of a jury instruction is to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict." *Chambers,* 337 Md. at 48, 650 A.2d at 729 (1994); *see also General v. State,* 367 Md. 475, 485, 789 A.2d 102, 108 (2002) ("Jury instructions direct the jury's attention to the legal principles that apply to the facts of the case.").

■ We have discussed at length guidelines that a trial judge must follow in giving jury instructions. *See generally, Cruz v. State,* 407 Md. 202, 212, 222, 963 A.2d 1184, 1190, 1196 (surveying federal cases, which hold that "reversal is warranted when the defendant was prejudiced because the instruction undermined the closing argument already given by the defense," and holding that the supplemental instruction given prejudiced the defendant, despite being generated by the facts of the case). In *Dempsey v. State,* 277 Md. 134, 355 A.2d 455 (1976), we stated that the "decisions of this Court dealing with trial judges' comments to juries regarding evidence clearly support the principle that the judge should not reveal to the jury his opinion." *Dempsey,* 277 Md. at 148–49, 355 A.2d at 463; *see also Gore,* 309 Md. at 214, 522 A.2d at 1343 (1987) (holding that the judge's instruction regarding sufficiency of the evidence was "an indirect comment on the general weight of the evidence as to each count and outside the permissible scope of argument"). We emphasized the "high and authoritative position" of the judge, and cautioned that a trial judge should be " 'exceedingly careful in any remarks made by him

during the progress of a trial ... and should carefully refrain, either directly or indirectly, from giving expression to an opinion upon the existence or not of any fact, which should be left to the finding of the jury.'" *Dempsey,* 277 Md. at 149, 355 A.2d at 463 (quoting *Elmer v. State,* 239 Md. 1, 10–11, 209 A.2d 776 (1965)). Further, it is important to note that the intent of the trial judge in giving a particular instruction is irrelevant. *See Gore v. State,* 309 Md. 203, 522 A.2d 1338 (1987). In *Gore,* we stated that although we thought "it [was] clear that the trial judge below was attempting to communicate [proper legal principles] to the jury in order to cure what the trial judge perceived as an improper statement in defense counsel's closing argument[,]" we agreed with the defendant that the instruction may have improperly influenced the jury. *Gore,* 309 Md. at 212, 522 A.2d at 1342.

In *Patterson v. State,* 356 Md. 677, 741 A.2d 1119 (1999), we clarified that while Rule 4–325(c) requires instructions to be given on the applicable law, the same does not apply to facts and inferences. *Patterson,* 356 Md. at 684, 741 A.2d at 1122. Discussing the many inferences that may be drawn regarding a missing piece of evidence, we stated that the

emphasis of one possible inference out of all the rest by a trial judge can be devastatingly influential upon a jury although unintentionally so. As this Court has stated in the past in regard to missing witness instructions, when the inference is communicated to the jury as part of the judge's binding jury instructions, *it creates the danger that the jury may give the inference undue weight. At the very least, a trial judge's jury instruction may have the effect of overemphasizing just one of the many proper inferences that a jury may draw.*

*Id.* (emphasis added) (internal citations and quotations omitted); *see also David v. State,* 333 Md. 27, 52, 633 A.2d 867, 879 (1993) (stating that "a trial judge's jury instruction on the missing witness inference may have the effect of overemphasizing just one of the many proper inferences that a jury may draw."). Further, it is important to note that " '[t]he failure to grant an affirmative instruction does not remove the availabili-

ty of the inference. . . . Possibly for that reason, judges hesitate to grant [such instructions]; they do not wish to emphasize one legitimate inference over all others which the jurors have been told are solely within their judgment.' " *Patterson,* 356 Md. at 685, 741 A.2d at 1123 (quoting *Bailey v. State,* 63 Md.App. 594, 611–12, 493 A.2d 396, 404 (1985)). Additionally, in discussing the influence of the trial judge in comparison to that of counsel when commenting on inferences to be drawn, we have stated that the "argument by counsel to the jury will naturally be imbued with a greater gravitas when it is supported by a[n] instruction on the same point issued from the bench." *Cost v. State,* 417 Md. 360, 381, 10 A.3d 184, 196–7 (2010) (pointing out that an instruction issued from the bench has more " 'force and effect than if merely presented by counsel,' ") *Cost,* 417 Md. at 381, 10 A.3d at 197 (quoting *Hardison v. State,* 226 Md. 53, 62, 172 A.2d 407, 411 (1961), but cautioning that an instruction from the bench "runs the risk of 'creating the danger that the jury may give the inference undue weight,' ") *Cost,* 417 Md. at 381, 10 A.3d at 197 (quoting *Davis v. State,* 333 Md. 27, 52, 633 A.2d 867, 879 (1993)).

When we review a trial court's ruling to grant or decline a proposed jury instruction, "we must determine whether the requested instruction was a correct statement of the law; whether it was applicable under the facts of the case; and whether it was fairly covered in the instructions actually given." *Gunning v. State,* 347 Md. 332, 348, 701 A.2d 374, 381 (1997) (*quoting Grandison v. State,* 341 Md. 175, 211, 670 A.2d 398, 415 (1995), *cert. denied,* 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996)). We review the trial court's decision under an abuse of discretion standard, and "[t]he court's failure to fulfill this function can amount to error, that ordinarily requires reversal." *Gunning v. State,* 347 Md. at 351, 701 A.2d at 383 (internal quotation omitted); *see also Cost,* 417 Md. at 368–69, 10 A.3d at 189 ("we will reverse the decision if we find that the defendant's rights were not adequately protected"). We have said:

Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order of the trial court is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

*Gunning,* 347 Md. at 351, 701 A.2d at 383 (quoting *In Re Don Mc.,* 344 Md. 194, 201, 686 A.2d 269, 272 (1996)). Moreover, "a proper exercise of discretion involves consideration of the particular circumstances of each case," and, "[t]he [exercise of] discretion being for the solution of the problem arising from the circumstances of each case as it is presented." *Gunning,* 347 Md. at 352, 701 A.2d at 383–84 (internal citations omitted).

In the present matter, considering the particular facts of the case, the trial judge abused her discretion by giving the requested jury instruction. The instruction was not proper under the facts of the case, was fairly covered in the instructions actually given, and, rather than solving a problem arising from the circumstances of the case, created a problem that unfairly prejudiced the defendant's case.

Petitioner argues that the trial judge abused her discretion when she instructed the jury that **"there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case."** (Emphasis added.) Atkins acknowledges that the instruction was a correct statement of the law, but argues that the instruction violated his rights to confront the evidence against him and to due process of law for three reasons: "(1) it usurps the province of the jury; (2) it is improper commentary on the evidence; and (3) it suggests that a defense [of] lack of scientific evidence strategy is improper." Regarding the first reason, Atkins argues that the instruction "indirectly tells the jury that the absence of scientific evidence is not relevant to the determination of guilt, thus usurping the jury's role." Relying on *Dempsey v. State,* Atkins argues that the instruction constitut-

ed improper commentary on the evidence because it "was an indirect comment on the weight of the absence of scientific evidence," which is a factual issue for the jury to determine. Petitioner asserts that the instruction "suggests the absence-of-scientific-evidence defense is improper, requiring a curative instruction by the judge [despite the fact that] this is an appropriate defense not warranting a curative instruction."

The State contends that the instruction was properly given, stating that the instruction was a "correct statement of the law, ... applicable to the facts in this case, and it was not fairly covered by the other instructions." According to the State, the investigative techniques instruction is justified in order to ensure that the government is not prejudiced by advances in technology, and because there is no duty to employ a specific procedure when other "evidence is proof beyond a reasonable doubt that a crime was committed." Further, the State argues that the trial court, "in giving the investigative technique instruction, did not comment on the sufficiency or weight of the evidence." The State maintains that the instruction was neutral on its face, and "expressly [told] the jury that it may consider the fact that the State did not utilize certain investigative techniques or scientific tests in deciding whether the State met its burden of proof."

Although we have not dealt previously with the particular issue in this case, whether a trial judge may instruct the jury that the State is not required to produce certain evidence, the Court of Special Appeals dealt with the same jury instruction at issue before us in *Evans,* 174 Md.App. 549, 922 A.2d 620 (2007). In *Evans,* police engaged in an under-cover narcotics purchase, in which the defendant provided police with illegal drugs. *Evans,* 174 Md.App. at 554, 922 A.2d at 623. During both cross-examination and later during closing argument, defense counsel emphasized the fact that neither video nor audio equipment was employed to record the transaction. *Evans,* 174 Md.App. at 562–63, 922 A.2d at 628. Over defense objection, the trial judge in *Evans* instructed the jury that there was "no legal requirement that the State utilize any

specific investigative technique or scientific test to prove its case." *Evans,* 174 Md.App. at 562, 922 A.2d at 628. The trial judge stated that the "issue [was] generated specifically in this case, based on the cross-examination." *Evans,* 174 Md.App. at 565, 922 A.2d at 629.

On appeal, the defendant argued that the instruction "relieved the State, in the minds of the jurors, of the burden to establish guilt beyond a reasonable doubt." *Evans,* 174 Md. App. at 562, 922 A.2d at 627. The Court of Special Appeals affirmed the conviction and the use of the instruction, stating that the instruction was "a correct statement of the law, was applicable to the facts in the case and was not fairly covered by other instructions given." *Evans,* 174 Md.App. at 570, 922 A.2d at 632. Further, the intermediate appellate court stated that the "robust and vehement closing arguments of counsel ... warranted giving the instruction," and that "contrary to counsel's argument, there is no requirement on the part of the State to produce other types of evidence." *Id.*

*Evans,* however, is distinguishable from the present case for multiple reasons. First and foremost, in *Evans,* the relevant legal reasoning regarding the instruction is dicta. As the court stated, "[t]he record clearly demonstrates that [defendant's] counsel failed to object to the instruction at issue during the proceedings," and further that "the [defendant's] failure to raise such issue in the trial court precludes us from such consideration on appeal." *Evans,* 174 Md.App. at 566, 922 A.2d at 630. Despite holding that the issue was waived, the intermediate appellate court engaged in a legal analysis of the issue, which was therefore not authoritative or essential in the determination of the case. Further, unlike the case at hand, the missing evidence in *Evans,* i.e., photographic or video evidence of the drug transaction, was not of critical importance to the case. Instead, the State relied on the eye witness testimony and identification of two detectives directly involved in the transaction. *Evans,* 174 Md.App. at 553–56, 922 A.2d at 622–624. The failure of police to provide additional evidence was therefore not a crucial issue, despite the defense argument that such evidence could possibly have

served to bolster the State's case in order to establish guilt beyond a reasonable doubt. *Evans,* 174 Md.App. at 562–63, 922 A.2d at 628.

By contrast, in the case *sub judice,* the only issue before the jury was whether Atkins acted in self defense, and the main piece of physical evidence upon which the jury could base that determination was the particular knife found in Atkins's home. In its closing argument, the State relied heavily on the large black knife found at Atkins's home, arguing that "it is the knife that makes this case serious," in order to refute the claim of self defense. Conversely, the defense claimed that Atkins was attacked by Holland and the Davis sisters, and Atkins used a pocket knife to defend himself from his attackers. Thus, the knife used was of critical importance in the case, considering its size and character, and the defense sought to discredit the alleged connection between the knife found at Atkins's home and the crime. Unlike in *Evans* where the non-existent evidence, pictures or video of the transaction, were supplemental evidence which would have supported the eye witness accounts, the evidence lacking here could have been direct evidence to affirmatively linking the knife introduced to the alleged assaults. In order to find Atkins guilty, the jury would have to believe the State's argument connecting the knife to the crimes. The instruction here, unlike in *Evans,* addressed directly the State's demonstrative evidence introduced against Atkins.

Finally, in *Evans,* defense counsel gave "robust and vehement closing argument" in addition to extensive cross-examination on the issue of the failure of police to record the transaction. *Evans,* 174 Md.App. at 570, 922 A.2d at 632. The trial court stated explicitly that the cross-examination warranted the instruction, and the Court of Special Appeals also relied on the closing argument to justify the use of the instruction. *Evans,* 174 Md.App. at 570, 565, 922 A.2d at 632, 629. Thus, the intermediate appellate court viewed the instruction as necessary to correct defense counsel's argument that the State was required to produce certain evidence. *Evans,* 174 Md.App. at 570, 922 A.2d at 632. In the present

case, defense counsel briefly cross-examined on the issue, but did not argue lack of evidence in closing. Unlike in *Evans,* where counsel distorted the law, thus requiring a curative instruction, counsel in the present case merely pointed out on cross-examination what procedures were available but did not incorrectly state the law or the State's burden.

Having distinguished the legal reasoning of *Evans* from the case at hand, we shall determine whether the instruction given was appropriate in the present case. As discussed above, the foot long, non-folding black knife was the centerpiece of the State's case and thus the instruction was of critical importance. The primary concern when evaluating whether a trial judge abused his or her discretion in giving this type of instruction is the risk that "such an instruction will run afoul of the prohibition against relieving the State of its burden where the ... relation [of the instruction] to the reasonable doubt standard [is] unclear." *Evans,* 174 Md.App. at 571, 922 A.2d at 633. This case exemplifies that risk; the instruction as worded effectively undermined the defense theory of self defense, and relieved the State of its burden to prove guilt beyond a reasonable doubt.

There was an insufficient basis in this case generating a need for a curative or cautionary jury instruction clarifying the State's burden in regards to specific investigative techniques. Further, the issue regarding lack of forensic evidence was generated when the State sought to have the knife admitted as evidence with no corroborating evidence linking it to the crime, save speculation that the wounds inflicted on the victims were consistent with the particular knife found in Atkins's bedroom. Defense counsel, outside the presence of the jury, objected to the admissibility of the knife, stating that "[i]t's just total speculation that this knife had any connection to this incident," and further that "from my understanding there's not going to be any testimony of any forensic evidence, such as that there might be blood on [the knife], or any human skin cells, or anything like that." Regarding possible testimony for the State from Holland's treating physician that it was "possible [that] this knife could cause the injuries," defense

counsel argued that such testimony was a "broad statement, because virtually any sharp object could probably, could possibly cause, you know, cutting-type injuries." Despite these concerns, the trial judge overruled defense counsel's objection, and allowed the evidence to be admitted.[6]

Once overruled by the trial judge, defense counsel had every right to inquire about steps the State undertook to connect the defendant and the particular knife found in Atkins's home to the crime. As we have held previously, a defendant has the right to raise a defense based on the lack of evidence presented by the State. *Sample v. State*, 314 Md. 202, 207, 209, 550 A.2d 661, 663, 664 (1988). We stated in *Sample* that when "the State has failed to utilize a well-known, readily available, and superior method of proof to link the defendant with the criminal activity, the defendant ought to be able to comment on the absence of such evidence." *Sample*, 314 Md. at 207, 550 A.2d at 663 (1988) (interpreting *Eley v. State*, 288 Md. 548, 419 A.2d 384 (1980) (which held that the trial court erred "in precluding counsel from arguing the logical inferences from the facts and gaps in [the] evidence," *Eley*, 288 Md. at 551, 419 A.2d at 385, and that under the circumstances, "it is not unreasonable to allow the defendant to call attention to [the State's failure to produce fingerprint evidence]," *Eley*, 288 Md. at 555, 419 A.2d at 387)). In order to probe into the utility of scientific testing to connect the knife introduced by the State to the crimes charged, defense counsel engaged in cross-examination of the detective, asking whether the police department was capable of looking for skin cells or blood on the knife, and whether such testing was performed in this case.[7] The examination was a legitimate, brief, and reason-

---

6. The State argued that the knife was relevant because the knife was found in Atkins's bedroom, in a box, and the trial judge seemed persuaded by this reasoning in overruling defense counsel's objection to the admission of the knife.

7. During the cross-examination, the officer acknowledged that "it was possible that trace evidence could have been found on the knife had it been tested."

able inquiry into the connection between the knife and the crime. At oral argument before this Court, however, the State argued that defense counsel opened the door to the cautionary instruction by cross-examining the detective regarding investigative techniques. Even assuming, without deciding, that the cross-examination, in and of itself, opened the door to an investigative techniques instruction, we fail to see how the instruction employed did anything other than nullify or undermine the proper defense that the knife relied on by the State could not be connected to the crime.

The instruction did not adequately protect Atkins's right to a fair trial because the instruction invaded the province of the jury and constituted commentary on the weight of the evidence, which comment was improper. As stated by Atkins, "[i]t was the jury's function to determine what inferences were to be drawn from the police [officer's] failure to test the knife for DNA evidence. But the trial judge usurped this role." Basically, the instruction directed the jury to ignore the fact that the State had not presented evidence connecting the knife to the crime, implying that the lack of such evidence is not necessary or relevant to the determination of guilt, and to disregard any argument by defense to the contrary. In the words of Petitioner's counsel at oral argument before this court, "the instruction effectively plugged a hole in the State's case."

Even if the instruction was an accurate statement of the law, the "high and authoritative" position of the trial judge necessitates that the judge be more vigilant and careful in refraining from commenting on inferences to be drawn by the jury. The State was permitted to present the large black knife to the jury that the defendant challenged as not being connected to the alleged crime. The defense therefore had the right to challenge the State's case as to the quality of the evidence presented. Hence, it was well within the province of the jury to infer, or not to infer, as a matter of fact, that the knife introduced by the State was the knife used to commit the crimes alleged. Through the instruction, however, the judge commented on that inference, thus invading the prov-

ince of the jury. Similar to *Cost,* the instruction in this case had more "force and effect than if merely presented by counsel," and certainly created the danger that the jury would give the judge's comments on the inference to be made from the lack of evidence undue weight. *Cost,* 417 Md. at 381, 10 A.3d at 197. We can envision a scenario in which a jury, discussing the evidence presented and the lack of scientific testing, would remember the trial judge telling them that the State need not present such evidence, and conclude that the State does not have to connect affirmatively the defendant to the knife and the crimes. This would, and did, infringe on Atkins's right to have the jury, rather than the judge, determine the facts and for the State to prove guilt beyond a reasonable doubt. It was therefore error for the trial judge to give the instruction.

Finally, we emphasize that our conclusion that the instruction as given was invalid is based on the particular facts in this case, and we do not hold that an investigative techniques instruction would never be proper.[8] As pointed out in *Evans,* the key to producing a valid jury instruction is ensuring that the State is properly held to its burden, and any instruction regarding what the State must produce in proving its case must be properly related to the reasonable doubt standard. For example, *United States v. Saldarriaga,* 204 F.3d 50 (2nd Cir.2000), on which the Court of Special Appeals relied in *Evans,* provides guidance in determining when such an instruction would be valid. The instruction in *Saldarriaga* was much more detailed than the present instruction, and went to great lengths to fully explain that, although the government was not obligated to use particular techniques, the jury could consider the lack of such evidence in determining whether the

---

**8.** The better practice, however, is for a trial judge to refrain from commenting on inferences to be drawn by the jury. While it would be proper to tell the jury that the State may prove its case by whatever means it chooses, we caution against commenting in the negative, i.e., what the State does *not* have to do, as this practice, considering the context in which the instruction is given, runs the risk of relieving the State of its burden.

government could meet its burden. *Saldarriaga*, 204 F.3d at 52. Specifically, the trial court in *Saldarriaga* instructed the jury that:

> The law is clear that the government has no obligation to use any particular techniques. The government's techniques [are] not on trial here.... The government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true ... However, if suggesting things they could have done leads you to think, well maybe I have a reasonable doubt because I didn't have any evidence on that subject, if that happens, why, then, of course, that is a reasonable doubt like anything else.

*Id.* The court went on to provide the jury with an example to illustrate when not having the evidence could create a reasonable doubt as to whether the government could prove its case. *Id.*

In this way, the court in *Saldarriaga* much more clearly, and in a neutral way, related the government's burden to prove its case beyond a reasonable doubt to the correct statement of the law, that the government was not obligated to perform specific techniques. The instruction given in the present case, however, effectively relieved the State of its burden because the instruction did not clearly explain to the jury the relation between the fact that the State was not required to produce specific evidence on the one hand, with the continuing obligation of the State to prove the defendant's guilt beyond a reasonable doubt on the other hand. Instead, rather than aiding the jury in understanding the case and providing guidance for deliberations, the instruction resulted in commentary on specific evidence, or lack thereof, and invaded the province of the jury. Therefore, we shall reverse the judgment of the Court of Special Appeals and hold that the trial court erred in giving the instruction as written, based on the facts of this case.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENTS**

OF THE CIRCUIT COURT FOR MONTGOMERY COUN-
TY AND REMAND THE CASE TO THAT COURT FOR A
NEW TRIAL. COSTS IN THIS COURT AND THE
COURT OF SPECIAL APPEALS TO BE PAID BY
MONTGOMERY COUNTY.

HARRELL, BATTAGLIA, and MURPHY, JJ., Concur.

Concurring Opinion by HARRELL, J.

Although I concur in the judgment and most of the reason-
ing of the Majority, I write separately to consider a broader
array of situations where "anti-CSI effect"[1] or "no duty"
instructions may be appropriate, beyond more than the mod-
est discussion in the Majority opinion.

The Majority opinion's analysis of the impropriety of the
wording of the trial court's jury instruction in the present case
could be read by some to imply that the instruction—

> During this trial, you have heard testimony of witnesses and
> may hear argument of counsel that the State did not utilize
> a specific investigative technique or test. You may consider
> these facts in deciding whether the State has met its burden
> of proof. You should consider all of the evidence or lack of
> evidence in deciding whether the defendant is guilty. *How-
> ever, I instruct you that there is no legal requirement that
> the State utilize any specific investigative technique or
> scientific test to prove its case.* Your responsibility as
> jurors is to determine whether the State has proven based
> upon the evidence the defendant's guilt beyond a reasonable
> doubt.

Majority op. at 441–42, 26 A.3d at 982–83 (emphasis added)—
is inappropriate, even in situations where the testimony or
argument is introduced by either party (but usually the de-

---

1. The Majority opinion can not bring itself to utter the phrases "CSI
effect" or "anti-CSI effect." Although both phrases certainly are pop
culture in origin, they communicate concepts about which this case is
all about, especially in the eyes of the general public, some of whom
actually may read judicial opinions from time-to-time, or read about
them in more widely-circulated popular media; therefore, usage of
these phrases aids in communication.

fense) that may warrant a curative, "anti-CSI effect" instruction. The Majority's use of *United States v. Saldarriaga*, 204 F.3d 50 (2d Cir.2000), to illustrate its proposition that "we do not hold that an investigative techniques instruction would never be proper," without more, is, I think, too slight an assessment of the "lay of the land" with regard to the "anti-CSI effect," or "no duty," instruction. *See* Majority op. at 454–55, 26 A.3d at 990–91. This topic is contemporary, still emerging, and is therefore "hot." Accordingly, I choose to spill more ink on this topic.

## I. *The "CSI Effect"*

Fiction long has been noted to influence popular expectations of reality and, although some fiction of relatively recent vintage came to fruition [2]—robots, wireless communication, and space travel—much of the current world of television fiction is aimed at altering our perception of the reality of our world today, rather than imagining a possible future world. In this regard, "courtroom" or "legal" dramas have been "hooking" viewers since the days of *Perry Mason* and *Matlock.* Television viewers have become accustomed also to getting a "real" look into courtrooms with shows like *The People's Court* and *Judge Judy.*

Modern "forensic" dramas began in 1990, with *Law & Order,* which purported to document police investigations and courtroom proceedings in modern New York City. Running for twenty seasons, the show inspired several spin-offs, such as *Law & Order: SVU* and *Law & Order: Criminal Intent.* The success of "forensic" dramas—whether purporting to be reality or purely fiction—skyrocketed in 2000 with the debut of *CSI: Crime Scene Investigation,* referred to as "the most

---

**2.** *See* Back to the Future Part II (Universal Pictures 1989) (predicting correctly the use of modern fingerprint access, the ability to project multiple television channels simultaneously on the same screen, the presence of a baseball team in Miami, motion-controlled video games, etc.). In the predecessor film, Back to the Future (Universal Pictures 1985), Marty McFly asks rhetorically: "Who knows if they've got cotton underwear in the future. I'm allergic to all synthetics." Fortunately, the films were not prophetic entirely.

popular television show in the world" at one time. *See* Donald
E. Shelton, *The "CSI Effect": Does it Really Exist?*, http://
www.nij.gov/journals/259/csi-effect.htm (last visited 28 July
2011). The show spawned several further spinoffs, all of
which garner millions of viewers per week—in a 2006 Nielsen
rating, thirty-million people watched *CSI* in one night; seven-
ty-million people watched one of the three *CSI* shows; and
forty-million people watched two other forensic dramas, *With-
out a Trace* and *Cold Case. Id.*

The popularity of forensic dramas garnered increased media
attention in recent years, with speculation that the shows
produced a "CSI effect" that may skew jury verdicts, most
frequently in criminal law matters. The theory behind the so-
called "CSI effect" is that the millions of viewers of forensic
dramas develop unrealistic expectations about the availability
and results of specific scientific forensic techniques, such as
DNA sequencing, fingerprint analysis, and ballistics analysis,
increasing the likelihood of a finding of "reasonable doubt"
where such forensic evidence is not produced, and, thus, an
increased likelihood for an acquittal or hung jury. *See* Tom R.
Tyler, *Viewing CSI and the Threshold of Guilt: Managing
Truth and Justice in Reality and Fiction,* 115 YALE L.J. 1050,
1052 (2006); *see also Sweney v. Dep't of Corr.,* 2011 WL
1376766, at *8, 2011 U.S. Dist. LEXIS 39585, at *22 (W.D.N.Y.
11 April 2011) ("Some researchers have recently noted that
the plethora of television programs emphasizing forensic evi-
dence . . . have engendered an unrealistically high expectation
by the public that forensic evidence is required for proof of
guilt."). The "CSI effect," however, can refer more generally
to any influence that such programs have on any group
involved in a courtroom proceeding. *See* Luke Francis Geor-
gette, *The Hung Jury: Scholarly Consensus on the Value of
the CSI Effect in the Future of American Justice,* INTERSECT,
Vol. 3, No. 1, at 11 (2010). Although debate continues regard-
ing whether a "CSI effect" actually exists,[3] among researchers

---

3. Two recent articles argue that the "CSI effect" is a figment of the
 media's imagination, and that the "effect" was created to explain the

that believe it does, the actual effect on jurors in the courtroom is a subject of great debate.

In 2005, the Maricopa County (Phoenix) Attorney's Office surveyed 102 Arizona prosecutors, with jury trial experience, regarding experiences with a possible "CSI effect" among juries. *See CSI: Maricopa County, The CSI Effect and its Real–Life Impact on Justice*, at 5 [hereinafter MARICOPA], *available at* http://www.ce9.uscourts.gov/jc2008/references/csi/ CSI_Effect_report.pdf. Prosecutors in Maricopa County regularly meet with jurors to obtain feedback after verdicts. *Id.* Thirty-eight percent of prosecutors believed that a lack of forensic evidence to corroborate other "sufficient" evidence resulted in either an acquittal or hung jury; a similar percentage has been noted also from a survey of Florida prosecutors. *See id.; see also* Michael J. Watkins, *Forensics in the Media: Have Attorneys Reacted to the Growing Popularity of Forensic Crime Dramas?*, at 64 (2004), http://www.coolings.net/ education/papers/ Capstone–Electronic.pdf (last visited 28 July 2011) (finding that up to 25% of Florida prosecutors surveyed reported experiencing jurors with skewed impressions of the criminal justice system based on depictions in forensic crime dramas). The Maricopa County survey cited several criminal

---

unexpected outcomes in some highly publicized criminal trials. *See* Luke Francis Georgette, *The Hung Jury: Scholarly Consensus on the Value of the CSI Effect in the Future of American Justice*, INTERSECT, Vol. 3, No. 1, at 11 (2010). One article, for example, points to the possibility of a *pro*-prosecution effect, if any, but discounts that possibility by stating that "before the 'CSI Effect' has time and media repetition to embed itself into the psyche of the public and members of the justice system, it should be exposed for what it is: nothing more than fiction." Kimberlianne Podlas, *"The CSI Effect": Exposing the Media Myth*, 16 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 429, 465 (2006). Yet another study notes that "[t]he CSI effect has become an accepted reality by virtue of its repeated invocation by the media"; however, "no existing empirical research shows that it actually occurs[.]" Tom R. Tyler, *Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction*, 115 YALE L.J. 1050, 1083 (2006). Tyler further argues that there are several equally plausible alternative explanations for "the allegedly increasing acquittal rate that has led to speculation about a possible CSI effect." Tyler, *supra*, at 1084.

cases in the county to corroborate the prosecutors' belief in the negative ramifications of the "CSI effect":

In *State v. Everett Black,* on September 21, 2001, the defendant was caught with drugs which were in a cigarette pack in a defendant's pocket. He admitted the pack was his but denied the drugs were his or that he knew the drugs were there. The foreperson later said he watched CSI and that investigators should have done extensive fingerprinting, DNA testing, and other forensics, and that he did not think the prosecutors did enough. He had convinced the entire panel that on television they do so much more and that the police officers did not do a good job.

In *State v. James Calloway,* Arizona Department of Corrections officers found a syringe in a cell with a note signed by "Jimbo" attached to it on June 13, 2002. Inmate "Jimbo" was found with a fresh mark on his arm consistent with syringe use, and admitted the syringe was his when he retrieved it from prison officials and signed the receipt. The jury criticized the prosecution because there was no DNA or fingerprint analysis on the syringe, and the jurors wanted a handwriting comparison on the note and the receipt.

MARICOPA, *supra,* at 7. Prosecutors seem generally to hold the view noted in the Maricopa County survey—"that the 'CSI effect' has made their job of obtaining convictions more difficult, because resources to do sophisticated testing, such as DNA analysis, are not available in every case." *Charles v. State,* 414 Md. 726, 732, 997 A.2d 154, 158 (2010).

Some researchers posit that, although the "CSI effect" is "real," it operates as a *positive* mechanism of the contemporary American justice system. *See* Georgette, *supra,* at 12. One study suggests that a possible alternative "CSI effect" is that, rather than heightening juror expectations of scientific evidence, *CSI* and its progeny have promoted the modern jury's desire to see that people are punished for the crimes they commit. *See* Tyler, *supra,* at 1065. Forensic television shows often dramatize real-life "mysteries" that have caught the public eye—an episode of *CSI: Miami* portrayed a case

similar to that of the disappearance of Natalee Holloway, a young American girl who disappeared while on vacation in Aruba—and solve conclusively the cases with solid forensic evidence in the span of a single sixty minute episode. *See id.* People do not want to see wrongdoing go unpunished, which may be why juries have high expectations of forensic or scientific evidence. *See* Tyler, *supra,* at 1068 ("The desire to punish, and to restore the status of victims and the legitimacy of rules, is frustrated by the uncertainty that often exists about who is responsible for harm."). One of *CSI's* writers argued that, "[m]ost importantly, CSI returns the focus to exonerating the innocent . . . [i]f it's such a crime to reinvigorate the cliche that defendants are innocent until proven guilty, as a CSI writer, I'll happily take that charge." Richard Catalani, *A CSI Writer on the CSI Effect,* 115 YALE L.J. POCKET PART 76, 78 (2006).

Each of the studies discussed *supra,* and the various other studies scientists, professors, and public interest groups, diverge severely in their conclusions, due for the most part to the differing research methodologies—surveying only prosecutors, or prospective jurors, or attorneys in general—and may suffer from bias depending on the actors involved in the study. *See generally* Georgette, *supra,* at 7–14. Despite the divergence, the so-called "CSI effect" is injected into American jurisprudence and has led to changes in model jury instructions,[4] in prosecution tactics, and in both voir dire questions and jury instructions given by judges.

---

**4.** The Ohio Bar Association added, in 2009, "Warning on Outside Influence" to its jury admonitions, to be read either before or after voir dire, which reads:

> The effort to exclude misleading outside influences information also puts a limit on getting legal information from television entertainment. This would apply to popular TV shows such as Law and Order, Boston Legal, Judge Judy, older shows like L.A. Law, Perry Mason, or Matlock, and any other fictional show dealing with the legal system. In addition, this would apply to shows such as CSI and NCIS, which present the use of scientific procedures to resolve criminal investigations. These and other similar shows may leave you with an improper preconceived idea about the legal system. . . . [T]here are many reasons why you cannot rely on TV legal programs,

## II. *The National Response to the "CSI Effect"*

Throughout federal and state courts in America, prosecutors attempt to curb the possible "CSI effect" through "defensive prosecution" techniques, such as questioning in voir dire, presenting testimony regarding inconclusive forensic tests, and requesting specialized jury instructions (such as "anti CSI effect" or "no duty" instructions). Defense attorneys, on the other hand, seek to take advantage (understandably) of a "lack" of forensic evidence by pointing it out throughout trial, questioning police investigative techniques, and emphasizing in opening and closing statements the lack on the state's part of such evidence. *See State v. Cooke,* 914 A.2d 1078, 1088 (Del.Super.Ct.2007) ("[Defendants] are aware of the phenomenon and are, correctly and appropriately, taking advantage of it by asking witnesses about tests they know were not conducted and contending in closing that the failure to test raises reasonable doubt."). As the present case involves solely a question regarding a curative jury instruction, I will not discuss other methods of "defensive prosecution," although several courts have dealt with issues regarding voir dire questioning and admission of various sorts of evidence and testimony to combat the "CSI effect."[5]

---

including the fact that these shows (1) are not subject to the rules of evidence and legal safeguards that apply in this courtroom, and (2) are works of fiction that present unrealistic situations for dramatic effect. While entertaining, TV legal dramas condense, distort, or even ignore many procedures that take place in real cases and real courtrooms. No matter how convincing they try to be, these shows simply cannot depict the reality of an actual trial or investigation. You must put aside anything you think you know about the legal system that you saw on TV.

Ohio State Bar Association, *OSBA Jury Instructions* (2010), http://www. lawriter.net/NLLXML/getcode.asp?statecd=OH&codesec= UndesignatedJURY% 20ADMONITION&sessionyr=2009&Title=i&version=1&datatype=JURY+ADMONITION&noheader=0&no jumpmsg=0&userid=PRODSG&Interface=CM (last visited 27 July 2011).

**5.** Voir dire questioning has become a popular time for prosecutors to attempt to limit the influence of the "CSI effect" on perspective jurors. In *Goff v. State,* 14 So.3d 625, 653 (Miss.2009), the district attorney asked the jury pool:

Although the "CSI effect," if it exists, stems from *CSI* and other modern forensic dramas, it bears noting that signs of the so-called "CSI effect" have been recognized by federal courts since the 1970s (before there was a *"CSI"* television show). *See e.g., United States v. Cheung Kin Ping*, 555 F.2d 1069, 1073 (2d Cir.1977). In certain circumstances, a court may need to counter the defense's insinuation that law-enforcement policy in some way bears on the state's burden of proof.[6] In 1989, the Second Circuit Court of Appeals noted

> [C]an everybody tell me that they can separate what they see on TV from what you see in the courtroom? I know that sounds like a silly question, but some people go, oh, well, it was on CSI, so how come they don't do it in every case?
>
> \* \* \*
>
> So, can everybody tell me—and, again, this kind of goes to the burden of proof, you know, about what evidence you have—and can everyone tell me that they will listen to the evidence and not speculate because they don't have, say, DNA or they don't have fingerprints and things you may see or hear about on CSI?

This questioning, the court held, did not elicit a promise to convict from the venire, as the defense alleged, but rather asked if the prospective jurors could remain neutral and return a verdict based on the evidence presented. *See Goff*, 14 So.3d at 653.

Another method prosecutors use to curb the "CSI effect" is in the use of certain kinds of evidence. A defendant may highlight a lack of DNA or other forensic evidence at the scene of a murder in aid of an argument that it is not possible to commit murder without leaving behind any physical evidence. *See United States v. Fields*, 483 F.3d 313, 355 (5th Cir.2007). In order to counter this inference, the prosecution may attempt to use otherwise prejudicial crime scene photographs, a tactic which has been upheld by the Fifth Circuit due to the highly probative value of such evidence. *Id.* ("In this age of the supposed 'CSI effect,' explaining to the jury why the Government had little in the way of physical or scientific evidence was arguably critical to the Government's case.").

6. In *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1073 (2d Cir.1977), defense counsel told the jury in closing arguments that "you have a right to say by your verdict to the government, we don't want you to make deals with a man like Yuin." The man that defense counsel referred to as Yuin acted as an accomplice to the crime; in return for a decreased sentence, Yuin testified against Cheung. *See Cheung*, 555 F.2d at 1072. To counter the insinuation made by defense counsel, the judge instructed the jury in his charge that "[i]f . . . you want to send a message to the powers that be . . . then when the case is over write to your congressman, but don't let that desire to send any message affect you in the meantime in the performance of your sworn duty." *Cheung,*

that it was not a plain error for a judge to instruct the jury that "the Government is not required to use any particular law enforcement techniques...." *United States v. Sanchez Solis,* 882 F.2d 693, 697 (2d Cir.1989).

The main issue before the court in *Sanchez Solis* was not the use of "no duty" or "anti-CSI effect" curative instructions; the court's recognition of the appropriateness of such instructions, however, was a point of departure for several federal and state cases discussing so-called "no-duty" instructions. *See, e.g., United States v. Cota–Meza,* 367 F.3d 1218, 1223 (10th Cir.2004); *United States v. Walker,* 1995 WL 551361, at *5–6, 1995 U.S.App. LEXIS 26457, at *14–17 (4th Cir. 18 Sept. 1995); *United States v. Mason,* 954 F.2d 219, 222 (4th Cir.1992), *cert. denied,* 504 U.S. 925, 112 S.Ct. 1979, 118 L.Ed.2d 578 (1992); *Wheeler v. United States,* 930 A.2d 232, 238 (D.C.2007); *State v. Rodriguez,* 141 A.D.2d 382, 385–86, 529 N.Y.S.2d 318 (N.Y.App.Div.1988). "No duty" instructions recognize that defense tactics emphasizing repeatedly—often to the point of chastising law enforcement officials—the failure to use specific investigative techniques may influence jurors inappropriately. *See Wheeler,* 930 A.2d at 238 ("The purpose of the 'no duty' instruction is to counter an inference that evidence could have been—but was not—collected and presented to the jury would have undermined the government's case or been favorable to the defense."). As the colloquial name of this type of instruction implies, "no duty" instructions are meant to inform the jury that law enforcement "was under no duty" to gather certain evidence, such as fingerprints, or DNA, in cases where the defense implies improperly that the government was under such a duty. *See id.* Further, when a defendant argues or implies that a failure to undertake specific scientific tests or procedures violated standard law enforcement procedures, or that such

---

555 F.2d at 1073. The Second Circuit Court of Appeals held that the charge must reach " 'the point at which it appears clear to the jury that the court believes the accused is guilty,' " which this judge's charge did not. *Id.* (quoting *United States v. Nazzaro,* 472 F.2d 302, 303 (2d Cir.1973)).

procedures would have produced evidence favorable to the defendant, a "no duty" instruction has been held to be appropriate. *See Greer v. United States*, 697 A.2d 1207, 1211 (D.C.1997) ("It is ... improper to argue or imply that such a lack of proof violated standard police procedures (unless that fact is affirmatively established) or that corroborative evidence, if obtained, would have been favorable to the defendant."). The instruction is allowed, not because the defense argument about the absence of specific scientific evidence is improper, but, instead, because the defense has a right to comment on such an absence in arguing that the prosecution's burden of proof has not been met. *See Wheeler*, 930 A.2d at 238; *Brown v. United States*, 881 A.2d 586, 594 (D.C.2005) (" '[D]efense counsel may appropriately comment in closing argument on the failure of the government to present corroborative physical evidence.' " (quoting *Greer*, 697 A.2d at 1210)). The government, therefore, is not entitled to this instruction every time the defense points out that there is a lack of forensic evidence in a case. Without an anchor in the evidence—showing that police policy was not violated in failing to utilize such investigative techniques—or "defense argument that the instruction is intended to counter, the 'no duty' instruction runs the risk of confusing the jury by seeming to contradict the admonition in the reasonable doubt instruction...." *Wheeler*, 930 A.2d at 239; *see also Brown*, 881 A.2d at 594 ("Because [defense] counsel had not made a 'missing evidence' argument to the jury, the government was not entitled to a 'no duty instruction' as a matter of law[,]" and must "lay an evidentiary foundation entitling it to such instruction.").

In *United States v. Mason*, *supra*, the government charged Mason with possession of a firearm by a convicted felon. Two police officers chased Mason through a West Baltimore neighborhood and recovered a gun, which the officers believed the defendant threw away during the chase. *See Mason*, 954 F.2d at 220–21. The police failed to examine the gun for fingerprints, a fact defense counsel utilized at trial to attempt to establish reasonable doubt that the defendant had been carry-

ing a gun at all. *See Mason,* 954 F.2d at 222. In response, the trial judge gave the following instruction:

> During the trial you have heard testimony of witnesses and arguments by counsel that the government did not utilize specific investigative techniques. For example, there was reference to fingerprints and certain specific tests.
>
> You may consider these facts in deciding whether the government has met its burden of proof, because, as I told you, you should look to all of the evidence or lack of evidence in deciding whether the defendant is guilty. However, *you are also instructed that there is no legal requirement that the government use any of these specific investigative techniques to prove its case.*
>
> * * *
>
> Law enforcement techniques are not your concern. Your concern, as I have said, is to determine whether or not the evidence before you or the lack of evidence the defendant's guilt has been proven beyond a reasonable doubt.

*Id.* (emphasis added).

Mason argued that the instruction misled the jury by implying that it could not consider the government's failure to examine the gun for fingerprints. *Id.* The Fourth Circuit Court of Appeals held that, although the particular sentence that "law enforcement techniques are not your concern" is not clear completely, "viewed in their entirety, the instructions adequately advised the jury on the putative relevance of the officers' failure to test the gun for fingerprints." *Id.* Several federal courts, as well as our Maryland appellate brethren, have cited the *Mason* decision with approval. *See, e.g., Walker,* 1995 WL 551361 at *5–6, 1995 U.S.App. LEXIS 26457 at *14–17; *United States v. Corcoran,* 855 F.Supp. 1359, 1375 (E.D.N.Y.1994); *Evans v. State,* 174 Md.App. 549, 565, 922 A.2d 620, 629 (2007), *cert. denied, Evans v. State,* 400 Md. 648, 929 A.2d 890 (2007).

Massachusetts also has dealt with the fine line between permissible and impermissible curative, "anti-CSI effect" jury instructions. *See Commonwealth v. Seng,* 456 Mass. 490, 924

N.E.2d 285, 295–98 (2010). In *Seng*, the defense relied heavily on law enforcement's alleged "incomplete forensic investigation," caused by the police assumption that Seng was the culprit. *See Seng*, 924 N.E.2d at 295. Both sides referenced *CSI* multiple times throughout the trial—the defense referenced *CSI* in cross-examining the state's DNA expert, and the state asked a police officer whether "investigators on television programs such as 'CSI' use a dusting technique to search for fingerprints." *Seng*, 924 N.E.2d at 296. After each reference to *CSI*, the judge warned the jury that "they were not to assume that 'CSI accurately mirrors life in the outside world.' " *Seng*, 924 N.E.2d at 296–97. At the conclusion of the trial, the defense requested, and was granted, an instruction that advised the jury that "reasonable doubt as to the defendant's guilt could arise from a finding that law enforcement failed adequately to investigate the crime." [7] *Seng*, 924

---

**7.** This type of instruction is referred to in Massachusetts as the *Bowden* instruction, referring to *Commonwealth v. Bowden*, 379 Mass. 472, 399 N.E.2d 482 (1980). In *Bowden*, one of several defense tactics was to elicit, in cross-examination of police officers and expert witnesses, testimony regarding the non-existence of certain scientific tests. *See Bowden*, 399 N.E.2d at 491. The trial judge then instructed the jury that:

> [Y]ou have he[ard] questions asked in cross-examination that point to the absence of a particular type of evidence. 'Did you do this; isn't it a fact that,' and if the answer is in the negative, it is not in evidence before you. In other words, the lack of evidence or the non-existence of a certain type of evidence is certainly not to be considered by you as any evidence in this case. And I will point out that to you right now and get into it in much more detail later on.
>
> \* \* \*
>
> [T]here was one example where the counsel for the defendant asked about the lack of fingerprint evidence, was there any fingerprints. What I am trying to suggest to you is this. A case, a criminal prosecution rises or falls, if you want to use that phrase, on the evidence that is before you, and the fact that something wasn't done or non-evidence is not, quite obviously, to be considered by you in connection with making your judgment. You make your judgment about the evidence that is in fact before you in this case, not something that wasn't done.

*Bowden*, 399 N.E.2d at 491. The court held that giving the instruction was reversible error because it invaded the province of the jury to decide what inferences to draw by removing evidence from the jury's consideration. *See id.* The *Bowden* instruction, therefore, may be

N.E.2d at 296. Following immediately the giving of this instruction, the judge added:

> And I remind you that this is real life and not CSI. I say that without being facetious. It's been observed across the country that people who've watched that particular program and similar programs tend to think that life is all that sort of science fiction and it's not.
>
> Now, it may be, I say it may be, it may not be but if it is, then maybe you would like to have heard the testimony of a person or somebody or persons for that matter, that neither side had called [as] a witness. Once again, you may not speculate or guess as to what that witness's testimony might have been. Not knowing the testimony, of course, you can't tell which side it would have helped or hurt. I urge you, therefore, not to spend any time arguing about why so and so didn't testify.

*Id.* The defense argued that this instruction precluded impermissibly the jury from considering the defense's argument regarding the adequacy of the police investigation, and rendered moot the prior instruction that reasonable doubt may arise from an inadequate investigation. *See id.* Such an instruction, meant to counter the "CSI effect," explained the appellate court, implies that the actual capabilities of law enforcement forensics are nowhere near the capabilities portrayed on *CSI. See Seng,* 924 N.E.2d at 297. The court, however, stated that such an instruction can be problematic and unnecessary, as jurors should be trusted to separate fiction from reality. *See id.* Although the court cautioned against the use of such an instruction in the final charge, importantly, it did not find that giving the instruction was reversible error. *See id.* ("[T]he judge acted properly when he cautioned the jury about the relevance of 'CSI' after it was referenced in testimony, but it was undesirable for him to do so again in his jury instructions.").

---

summarized as "[t]he fact that certain tests were not conducted or certain police procedures were not followed could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors." *Id.*

Quite recently, in *State v. Collins*, 299 Conn. 567, 10 A.3d 1005 (2011), the Supreme Court of Connecticut discussed the reasoning behind the need for curative jury instructions similar to "anti-CSI effect" or "no duty" instructions. In *Collins*, defense counsel, in his closing argument, "challenged the adequacy of the police investigation," and the prosecution, in response, argued that defense counsel's claim that "the cops botched" the investigation was made without any evidence of its inadequacy. *Collins*, 10 A.3d at 1023. Following this interaction, the trial judge charged the jury that:

[T]he ultimate issue before you is not the thoroughness of the investigation or the competence of the police. The ultimate issue you have to ... determine is whether the state in the light of all the evidence before you has proved beyond a reasonable doubt that the defendant is guilty on one or more of the counts for which he is charged.

*Id.* The appellate court concluded that the instruction "did not mislead the jury or violate the defendant's right to present a defense" and further explained that the instruction reminded properly the jury of its core task—to determine guilt or innocence based on the evidence presented, rather than to evaluate adequacy of police tactics—and phrased the charge in neutral language that did not disparage the defendant's defense or endorse the prosecution's case. *See Collins*, 10 A.3d at 1026–27. Although in *Collins* the appellate court did not speak expressly to the "CSI effect," it supported its holding with cases speaking to that phenomenon directly.[8]

---

**8.** In its discussion of permissible and impermissible jury instructions of this type, the court in *State v. Collins*, 299 Conn. 567, 10 A.3d 1005 (2011) discussed several New York cases that dealt with curative jury instructions that were held to be impermissible. For example, in *People v. Rodriguez*, 141 A.D.2d 382, 529 N.Y.S.2d 318, 319–20 (1988), the defendant argued in testimony and closing argument that, because fingerprints were not found on the gun, the officers could have been mistaken that the defendant was in possession of the gun. In doing so, the defense attempted to corroborate the defendant's testimony that he was not carrying the gun with the fact that no fingerprints were found on the gun. *See Rodriguez*, 529 N.Y.S.2d at 320. Although held to be a permissible strategy, the trial court instructed the jury repeatedly that " '[f]ingerprints have nothing to do with the issues in this case' and the

These cases stand for the proposition that curative instructions may be appropriate, but only in certain circumstances. If the defense, for example, presents a "missing evidence" argument—implying that such "missing" evidence would favor the defense—or the prosecution provides evidence that supports the need for a curative instruction, it may be proper for a judge to give an "anti-CSI effect" or "no duty" instruction. The Third Circuit Court of Appeals provides an example of an instruction that may be proper:

> During the trial you heard testimony of witnesses and argument by counsel that the government did not use specific investigative techniques such as *(mention omitted techniques that have been addressed in testimony or argument; e.g., fingerprint analysis, DNA analysis, the use of recording devices).* You may consider these facts in deciding whether the government has met its burden of proof, because as I told you, you should look to all of the evidence or lack of evidence in deciding whether the defendant is guilty. However, there is no legal requirement that the government use any of these specific investigative techniques or all possible techniques to prove its case. There is no requirement to *(mention omitted techniques . . .).*

> Your concern, as I have said, is to determine whether or not the evidence admitted in this trial proves the defendant's guilt beyond a reasonable doubt.

---

jury should '[f]orget the fingerprints, because that's not what we're talking about here.' " *Id.* This instruction, the appellate court held, constituted reversible error, as it eliminated an essential element of Rodriguez's defense from the consideration of the jury and "all but told the jury not to consider [that] evidence." *Id.* (internal citation and quotation marks omitted).

The *Collins* court noted that *"Rodriguez* is inapposite because the trial court in the present case did not instruct the jury not to consider the defendant's argument or to reject his theory of the case." 10 A.3d at 1027. Instead, the instruction in *Collins* "drew attention to the issue of the adequacy of the investigation while reminding the jury that the central issue in the trial was the defendant's guilt or innocence." *Id.* This distinction is important to note in a case dealing with curative jury instructions, such as the present case.

FEDERAL JURY PRACTICE AND INSTRUCTIONS, THIRD CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS–CRIMINAL, Inst. 4–14—Specific Investigative Techniques Required, *available at* http://www.ca3.uscourts.gov/criminaljury/Nov2010/Final% 20update% 20Chapter% 204.pdf. Although the instructions are not mandatory, they have been cited in recent federal cases as an example of properly neutral instructions. *See, e.g., United States v. Humbert,* 2007 WL 2173392, at *6–7, 2007 U.S. Dist. LEXIS 54532, at *19 (E.D.Pa. 27 July 2007). Although I do not purport to subscribe to these specific instructions necessarily, similar instructions in a Maryland trial may help to take any possible "CSI effect" out of the courtroom and the jury room if either the prosecution or defense attempts, improperly, to take advantage of such outside influences.

## III. *The "CSI Effect" and the Present Case*

"Anti–CSI effect" tactics, such as the instruction given in the present case, are not an unexplored phenomenon in this country, and have been discussed to some degree in this state, as the Majority opinion acknowledges. *See* 421 Md. 434, 26 A.3d 979 (Majority op. at 449–51, 26 A.3d at 987–89) (discussing *Evans* ); *see also Charles,* 414 Md. at 731–32, 997 A.2d at 157–58 (discussing the use of voir dire questioning to combat the "CSI effect"). These cases, and others throughout the country, have not determined an infallible formula for combating the "CSI effect" in court, but have developed various frameworks.

The Majority opinion holds correctly that "the trial judge abused her discretion, under the circumstances," but emphasizes several times that the wording of the instruction—the use specifically of the phrase "I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case"—is the fatal flaw within the instruction. *See* 421 Md. 434, 26 A.3d 979 (Majority op. at 437–38, 448–49, 454, 455–56, 26 A.3d at 980, 987, 990, 991). The wording of the trial judge's instruction, however, is not the objection I take with this instruction;

rather, it is instead the situation in which the instruction was given. I explain.

Several of the cases discussed *supra* held that commenting in the negative—that law-enforcement officers need not utilize specific investigative techniques—is not per se non-neutral and improper.[9] Because the "Due Process obligation to preserve and disclose exculpatory evidence does not impose on the government an affirmative duty to collect [specific forensic] evidence," negative inferences may be permissible. *Wheeler*, 930 A.2d at 239 (internal citations and quotation marks omitted). The Majority opinion in the present case offers *Saldarriaga* as an example of a more clear and neutral instruction; however, the trial court in that case instructed the jury that "[t]he law is clear that the government has no obligation to use any particular techniques," which comments in the negative as to the government's obligation, similar to the instruction in the present case. 204 F.3d at 52. For that reason alone, *Saldarriaga* is not a good example of the premise for which it is offered in the Majority opinion.

Further, the phrase (as in the present case), "I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case," alone does not cause necessarily the instruction to be non-neutral and impermissible. The instruction must be read as a whole and, although specific words or phrases may not be the "best" to use, if, when read together, "the instructions

---

**9.** *See, e.g., United States v. Cota–Meza,* 367 F.3d 1218, 1223 (10th Cir.2004) (holding that giving an instruction that "there is no legal requirement that the government ... must use all known or available crime detection methods or any particular type of equipment in its investigations" is not an abuse of discretion); *United States v. Mason,* 954 F.2d 219, 222 (4th Cir.1992), *cert. denied,* 504 U.S. 925, 112 S.Ct. 1979, 118 L.Ed.2d 578 (1992) (similar); *United States v. Sanchez Solis,* 882 F.2d 693, 697 (2d Cir.1989) (similar); *United States v. Humbert,* 2007 WL 2173392, at *6–7, 2007 U.S. Dist. LEXIS 54532, at *19 (E.D. Pa. 27 July 2007) (similar); *Wheeler v. United States,* 930 A.2d 232, 238 (D.C.2007) (holding that instruction that "the Government is under no duty to conduct fingerprint tests" may be proper if there was "evidence that the police failed to gather available evidence or defense argument to that effect"); *People v. Jiovani,* 258 A.D.2d 277, 685 N.Y.S.2d 66, 66 (1999) ("The court properly instructed the jury ... that the People, in sustaining their burden of proof, were not required to take any particular investigative steps or present any particular kind of evidence.").

adequately advised the jury on the putative relevance" of the State's failure to employ specific investigative techniques, the instruction may be permissible. *Mason,* 954 F.2d at 222.

The instruction given in the present case, I believe, was improper not because of the specific wording, but because the circumstances of the case did not warrant a curative instruction. As the Majority opinion points out properly, the present case is distinguishable from *Evans* because "the intermediate appellate court [in *Evans* ] stated that the 'robust and vehement closing arguments of counsel ... warranted giving the instruction,' and that 'contrary to counsel's argument, there is no requirement on the part of the State to produce other types of evidence.'" Majority op. at 449, 26 A.3d at 987 (quoting *Evans,* 174 Md.App. at 570, 922 A.2d at 632). Because the present case did not involve "robust and vehement" closing arguments or testimony, the instruction was not warranted.

Several studies have posited that jurors may come to court with pre-conceived notions that forensic or scientific evidence, such as that depicted in *CSI,* is of greater weight than other forms of evidence. It is appropriate generally for a defendant to comment on a lack of forensic evidence or a failure of the police to use certain scientific techniques. When the defense, however, attempts to take advantage impermissibly of the so-called "CSI effect" by implying that the State was required to utilize specific techniques or that any missing forensic evidence would weigh in favor of the defense, the prosecution may be entitled to "anti-CSI effect" or "no duty" curative instructions. Although the defense tactics in the present case did not rise to a level that warranted a curative instruction, if it had, I would hold the instruction given by the trial judge in the present case was not per se improper.

Judges BATTAGLIA and MURPHY authorize me to state that they join the views expressed here.