42 A.3d 708

**Shawn Donte ALLEN**

v.

**STATE of Maryland.**

**No. 606, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

April 27, 2012.

Erin Murphy Ehman (Silverman, Thompson, Slutkin & White, PA, on the brief) Baltimore, MD, for appellant.

Michelle W. Cole (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., WRIGHT, IRMA S. RAKER (Retired, specially assigned), JJ.

EYLER, JAMES R., J.

Shawn Donte Allen, appellant, was convicted by a jury in the Circuit Court for Baltimore City of possession of cocaine with intent to distribute and related charges. On appeal, appellant challenges the circuit court's instruction to the jury with respect to "anti-CSI effect" and the court's replacement of one of the jurors with an alternate. A sub issue is whether recent Court of Appeals decisions holding that, under certain circumstances, "anti CSI effect" instructions are constitutionally improper, apply to this case. We shall hold that the decisions do apply and, based on an erroneous jury instruction, reverse appellant's convictions. We shall not reach appellant's second contention.

## Factual and Procedural Background

According to Baltimore City Police Detectives Craig Jester and Paul Geare, on July 23, 2008, they observed from their unmarked vehicle two individuals in a parked pickup truck pull a closed bag out of the truck's center console and place it "in the center of the front area of the truck." Both occupants then handled the bag. When the truck began moving, the detectives followed it in their vehicle. After the detectives activated their vehicle's emergency lights, the truck accelerated, and the truck's passenger threw a bag out of the window. After the truck stopped, the detectives took into custody appellant, who was the driver of the truck, and Jamal Douglas, the truck's passenger, and then recovered the bag. The bag contained a digital scale and eight smaller bags, each of which, it was later determined, contained several ounces of cocaine.

Beginning on February 4, 2011, appellant and Douglas were tried together for possession of cocaine with intent to distribute and related charges. Detectives Jester and Geare were the only witnesses, both called by the State. During cross examination of Detective Jester, counsel for appellant asked, "did you or your partner request any fingerprint analysis of

anything that was in that closed bag?" Detective Jester said that he did not. Counsel then asked "[d]id you request any DNA evidence of what was found in those two closed bags?" Detective Jester again answered that he did not.

On redirect examination by the State, Detective Jester testified that it was not common practice to conduct fingerprint analysis or DNA tests on evidence like the recovered narcotics. After the close of evidence, the State requested a jury instruction on "specific investigative techniques." The court heard argument and stated it would give the requested instruction.

> The court instructed the jury that

> [d]uring the trial you've heard testimony and you may hear argument of counsel that the State did not utilize a specific investigative technique or techniques or scientific tests, I instruct you that there's no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.

> During closing argument, The State told the jury that it

> might hear some defense complaints about there not being any DNA or there not being any fingerprints. Well, what's the point? This isn't a who done it. You ask for DNA and fingerprints when you don't [know] whose it might be. We know whose cocaine this was because we know Detective Geare and Detective Jester told us it was in between the Defendants and they both had their hands all over it.

Counsel for appellant also discussed the issue during closing argument, stating:

> [W]e raise the issue of DNA and prints because the State has requested and did receive a question about scientific tests. So, it's not what they proved, but what didn't they prove or what could they have proved in this case.

> Very simply, we'd have a evidence control, we'd have a chemist, fingerprint experts, could have absolutely subjected all of this evidence, especially, especially these plastic bags for DNA and for prints. Never done. Now, why wasn't it done? I'll tell you why it wasn't done. If you

refer to the testimony of the detectives who are here today, present, they make observations and they were crystal clear that they could see into a console area what was in that console area.

The remainder of defense counsel's closing argument focused on the reliability of the State's witnesses, the accuracy of the detectives' observations, the recovery of the physical evidence, the criminal agency of his client, and other matters.

During the trial, the State moved to strike one of the jurors after the juror was seen waving and smiling to someone in the courtroom audience. When questioned by the court, the juror stated she saw someone in the courtroom that she knew who "used to mess with, used to hang with [her children's] father." She also said that it would not affect her ability to serve impartially as a juror. The court questioned some spectators who were sitting in the area of the courtroom where the juror had waved, but none of the individuals acknowledged any familiarity with any of the jurors. The juror in question then informed the court that the person to whom she had waved was no longer in the courtroom, at which point the court granted the motion to strike, over defense objection, and replaced the juror with an alternate. Later in the trial, the court conducted additional inquiries aimed at divining to whom the stricken juror had waved, although the record does not reflect a definite identification of that person.

On February 7, 2011, the jury convicted appellant of all charges. This timely appeal followed.

### Questions Presented

Appellant presents the following two questions:

1. Was [appellant]'s constitutional right to a fair trial violated by the trial courts's instruction to the jury that there was no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case?

2. Did the trial court abuse its discretion in removing a juror?

We shall answer the first question in the affirmative, and as we shall reverse appellant's convictions on that basis, we decline to address the second question.

## Discussion

On appeal, appellant contends that the "anti-CSI" jury instruction was improper under the Court of Appeals' holding in *Atkins v. State,* 421 Md. 434, 26 A.3d 979 (2011).[1] Noting that the instruction propounded in this case was identical to the one challenged in *Atkins,* appellant argues that the instruction was improper, and thus, his conviction must be reversed. The State, while conceding that "[w]ith the hindsight of *Atkins* and *Stabb* [*v. State,* 423 Md. 454, 31 A.3d 922 (2011) ], it may have been error" for the court to issue the instruction challenged here, asserts that those cases should be applied only prospectively and not to convictions, like appellant's, rendered before those cases were decided.[2] In the alternative, the State argues that, even if the instruction was in error, the error was harmless due to the "overwhelming" evidence against appellant presented at trial.

The primary issue before us is whether the holdings in *Atkins* and *Stabb* are to be applied to cases pending on direct appeal or are to be applied entirely prospectively. Before discussing that issue, however, we shall address whether the instruction, based on the record in this case, is improper under *Atkins* and *Stabb,* assuming the decisions are applicable. The State stops just short of conceding the issue.

Prior to appellant's trial, this Court had decided *Evans v. State,* 174 Md.App. 549, 922 A.2d 620, *cert. denied,* 400 Md. 648, 929 A.2d 890 (2007), a narcotics case similar to the case before us. In that case, we examined a similar jury instruction. Evans was convicted of violating controlled dangerous

---

**1.** Appellant cites only to *Atkins* in his initial brief, as the *Stabb* decision was filed on November 22, 2011, after his brief was submitted to this court.

**2.** We note that there are several cases pending in this Court in which this issue has been raised.

substance laws. A detective, who conducted an undercover narcotics purchase, testified as the sole eyewitness to the transaction. *Id.* at 555, 922 A.2d 620. Defense counsel, in cross examining the detective, asked why the police had not employed "specific investigative techniques" during the operation. *Id.* at 562, 922 A.2d 620.

During closing argument, defense counsel "stressed the lack of the State's evidence to demonstrate a 'cross-check of reliability,'" and told the jury:

> Now, you have a right to assess the credibility of this detective. We understand that. But besides what he said and however you interpret what he said and how he said it and what areas he may have retrieved it from besides that, **there are no other real ways to prove this, because the arrest team, the lack of any video surveillance, whatever, none of that, absolutely none of that exists in this case.**

*Id.* at 562–563, 922 A.2d 620 (emphasis added).

Counsel for the co-defendant argued, in part:

> Now, I asked a number of questions, because I can't believe that people would get convicted on a case like this or even charged on a cases like this, but i asked—and [appellant's counsel] used the term "cross-checks"—but I asked about certain things because it makes sense to me that if you're going to convict somebody of felonies, of serious crimes, you've got to have some evidence. So how about a videotape or an audiotape? .... You have a situation where there are absolutely no scientific tests that implicate my client in any way. There's no audio. There's no video. There's no fingerprints. **There is nothing.**

*Id.* at 563–64, 922 A.2d 620 (Emphasis added. Footnote omitted.)

We noted that, while counsel for Evans' co-defendant objected to the jury instruction at issue, Evans' counsel failed to do so. *Id.* at 566, 922 A.2d 620. We also explained, on the merits, that the "robust and vehement closing arguments of [defense] counsel regarding the failure to employ audio or

video surveillance equipment and the lack of any other investigative or scientific evidence produced by the State warranted giving the instruction." *Id.* at 570, 922 A.2d 620.

The Court of Appeals addressed this type of jury instructions in *Atkins,* 421 Md. 434, 26 A.3d 979. Atkins was convicted of second degree assault. The evidence included a knife recovered from his home that the State contended was used in the assault. There was no testimony linking the knife to the crime, and the knife was not subjected to "any scientific or forensic testing." *Id.* at 439, 26 A.3d 979. On "cross-examination of the police officer who found the knife at issue in Atkins's home, defense counsel questioned whether forensic testing could have been done on the knife introduced into evidence." *Id.* at 440, 26 A.3d 979. The questioning on cross-examination "highlight[ed] the lack of evidence connecting the knife to the crime[.]" *Id.* Before closing arguments, the trial court granted, over defense objection, the State's requested jury instruction:

> During this trial, you have heard testimony of witnesses and may hear argument of counsel that the State did not utilize a specific investigative technique or scientific test. You may consider these facts in deciding whether the State has met its burden of proof. You should consider all of the evidence or lack of evidence in deciding whether the defendant is guilty. **However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case.** Your responsibility as jurors is to determine whether the State has proven based upon the evidence the defendant's guilt beyond a reasonable doubt.

*Id.* at 441–442, 26 A.3d 979 (emphasis in original). Atkins appealed, alleging that the court improperly commented on the evidence. *Id.* at 442, 26 A.3d 979. Relying on our decision in *Evans,* in an unreported opinion, we affirmed.

In a majority opinion written by Judge Clayton Greene, Jr., the Court of Appeals reversed, distinguishing *Evans* without overruling it. *Id.* at 449, 26 A.3d 979. The Court considered

our discussion in *Evans* to be dicta, stating that "[d]espite holding that the issue was waived, the intermediate appellate court engaged in a legal analysis of the issue, which was therefore not authoritative or essential in the determination of the case." *Id.* The Court explained further that "unlike the case at hand, the missing evidence in *Evans,* i.e., photographic or video evidence of the drug transaction, was not of critical importance to the case," because the State relied on eyewitness testimony. *Id.* Consequently, in *Evans* the "failure of police to provide additional evidence was therefore not a crucial issue, despite the defense argument that such evidence could possibly have served to bolster the State's case in order to establish guilt beyond a reasonable doubt." *Id.* at 449–450, 26 A.3d 979. Additionally, referring to *Evans,* the Court of Appeals noted the "robust and vehement closing argument," the cross examination as to the failure of the police to record the transaction, and defense counsel's distortion of the law, observed that in the case before it, the cross examination was brief, and lack of evidence was not argued in closing. *Id.* at 451, 26 A.3d 979.

After distinguishing *Evans,* the Court explained that the "instruction did not adequately protect Atkins's right to a fair trial because the instruction invaded the province of the jury and constituted commentary on the weight of the evidence, which comment was improper." *Id.* at 453, 26 A.3d 979. The Court described the constitutional underpinnings of the right to trial by jury, pointing to *Articles 5, 21, 23,* and *24* of the Maryland Declaration of Rights and the *Constitution of the United States, Amendments VI* and *XIV. Atkins* at 443, 26 A.3d 979. The Court further explained that "a defendant has the right to be tried by a fair and impartial jury, *Md. Dec. of Rts. Art. 21,* and the 'jury is the exclusive judge of the fact[s]' in a case." *Id.* (citing *Gore v. State,* 309 Md. 203, 210, 522 A.2d 1338 (1987)) (citing *Md. Dec. of Rts. Art. 23* )). Accordingly, the law "preclude[s] any instruction 'when [it] operate[s], ultimately, to relieve the State of its burden of persuasion in a criminal case, *i.e.,* its burden of proving beyond a reasonable doubt all the facts necessary to constitute the

offense.' " *Id.* (citing *State v. Evans,* 278 Md. 197, 207, 362 A.2d 629 (1976).

In reversing, the Court emphasized that "our conclusion that the instruction as given was invalid is based on the particular facts in this case, and we do not hold that an investigative techniques instruction would never be proper." *Id.* at 454, 26 A.3d 979. In that vein, the Court also stated that

we do not hold that an investigative or scientific techniques instruction would be improper under different circumstances, so long as the State is properly held to its burden, and the instruction regarding what the State must introduce in proving its case is properly related to the reasonable doubt standard.

*Id.* at 438, 26 A.3d 979. (Footnote omitted.). The Court called on the Maryland Criminal Pattern Jury Instruction Committee to draft a model jury instruction, balancing the State's burden of proof with the right of thc State to pick the evidence it wishes to introduce. *Id.*

In his concurring opinion, Judge Glenn T. Harrell, Jr. referred to the inconclusive nature of the scholarly research with respect to the existence of a CSI effect. He suggested, *inter alia,* that defense counsel may comment on the lack of forensic evidence or the failure of the police to use certain scientific techniques, but if the defense implies that the State is required to utilize specific techniques or that the absence of forensic evidence weighs in favor of the defense, an anti CSI curative instruction may be proper. *Id.* at 473, 26 A.3d 979.

In an opinion written by Judge Harrell, the Court of Appeals revisited the issue in *Stabb,* 423 Md. 454, 31 A.3d 922. Stabb was convicted of third-degree sexual assault and second degree assault. *Id.* at 457, 31 A.3d 922. After his convictions, Stabb appealed to this Court. In an unreported opinion filed before the decision in *Atkins,* based on our *Evans* holding, we affirmed. The Court of Appeals granted Stabb's petition for writ of certiorari.

The victim, who was a minor, testified. *Id.* A social worker also testified for the State, and on cross examination, defense counsel asked why the witness had not referred the victim for a Sexual Assault Forensics Exam. The witness responded, in part, that there was no indication of penetration and no possibility of the continued existence of physical evidence in view of the lapse of time between the incident and the witness's involvement. *Id.*

> The State requested that the court instruct the jury that
>
> [d]uring this trial, you have heard testimony of witnesses and may hear argument of counsel that the State did not use a specific investigative technique or scientific test. You may consider these factors in deciding whether the State has met its burden of proof. You should consider all the evidence or lack of evidence in deciding whether a defendant is guilty. However, I instruct you that there is no legal requirement that the State utilize any specific investigative technique or scientific test to prove its case. Your responsibility as jurors is to determine whether the State has proven based upon all the evidence the defendant's [sic] guilty beyond a reasonable doubt.

*Id.* at 460, 31 A.3d 922. Defense counsel objected, arguing, *inter alia,* that if

> the Court determines after I gave my closing argument that I gave a vigorous—then I would ask the Court to consider [the challenged instruction] but to give it prior to closing argument and without making any conclusion that I made a robust or vehement argument and basically harped on that fact, I would say its [sic] improper.

*Id.* at 461, 31 A.3d 922. The court granted the instruction. In closing argument, defense counsel

> focused heavily on the State's reliance on a single child witness and the inconsistent recollections of the investigating officers and the State's other witnesses. She also covered briefly the motive of [the victim's mother and grandmother] to encourage [the victim] to implicate Stabb,

the possibility of an alternative assailant, Stabb's alibi witnesses, and the lack of physical evidence. *Id.* at 463, 31 A.3d 922.

The Court, while again acknowledging that it was not declaring anti-CSI jury instructions improper per se, concluded that, on the facts of the case before it, the court abused its discretion in providing "essentially a preemptive jury instruction that there was 'no legal requirement for the State to utilize any specific investigative technique or scientific test to prove its case.' " *Id.* at 463, 31 A.3d 922.

*Stabb* contained a discussion, similar to that in *Atkins*, explaining the constitutional bases for the "grant to criminal defendants [of] the right to a fair trial, which includes a requirement that trial judges refrain from making statements that may influence improperly the jury." *Stabb,* 423 Md. at 463, 31 A.3d 922. The Court explained that *"Article 23 of the Maryland Declaration of Rights* states that 'the Jury shall be the Judges of the Law as well as of fact . . .,' which limits the trial court from giving jury instructions that comment on evidence properly before the jury." *Id.* at 463–464, 31 A.3d 922 (citations and quotations omitted).

In *Stabb,* Judge Harrell again referred to the inconclusive nature of the scholarly research on the CSI effect and noted that it was just as inconclusive as when *Atkins* was decided. *Id.* at 470, 31 A.3d 922.

The Court observed that, unlike in *Atkins*, the missing forensic evidence was not critical. Moreover,

although defense counsel commented on the lack of physical evidence, the overwhelming majority of her argument focused on the State's reliance on a single child witness, conflicting statements of the State's other witnesses, motive of [the victim's mother and grandmother] to influence [the victim's] statements, Stabb's alibi, and possibility of an alternative assailant. Nonetheless, the lack of scientific evidence was an integral part of the defense's theories. Another problem with the "anti-CSI effect" jury instruction in the present case is that it was given preemptively, *i.e.,*

before any explicit argument by the defense on the absence of DNA or fingerprint testing of [the victim] or her clothing.

*Id.* at 470–471, 31 A.3d 922. Additionally,

Stabb's defense argued properly and without undue emphasis the lack of corroborating physical evidence of the crime, and questioned [the State's witnesses] as to the likelihood of the existence of such evidence and why a SAFE was not performed, but did not 'harp' impermissibly on the lack of physical evidence in its case-in-chief or during closing arguments. In fact, the main thrust of Stabb's defense rested on an alibi theory. His closing arguments focused also on numerous ways the defense contended that the State had failed to satisfy its reasonable doubt burden, only one of which was its failure to perform a SAFE. When the defense did allude to the lack of corroborating physical evidence, its comments were 'legitimate, brief, and reasonable,' as in *Atkins*.

*Id.* at 471, 31 A.3d 922. The Court, on the basis just stated, distinguished the case from *Atkins* and *Evans*. *Id.* Under those circumstances, the Court explained, it

was up to the jury to weigh the absence of physical evidence corroborating Stabb's alleged assault on [the child victim], Stabb's alibi defense, and the testimony of the other defense witnesses. Further, Stabb did not advance a "missing evidence" argument that implied that "missing" evidence would favor him; rather, counsel alluded to the absence of corroborating physical evidence because the State chose not to administer a SAFE. . . . When the trial court injected the pertinent jury instruction into the jury's calculus, it had more force and effect than if merely presented by counsel, and could have influenced impermissibly the drawing by the jury of inferences regarding the absence of physical evidence. In giving the "anti-CSI effect" instruction to the jury, the trial court directed effectively the jurors not to consider the absence of a SAFE or corroborating physical evidence. The trial court invaded impermissibly the province of the jury deliberations with the given "anti-CSI effect" instruction under the circumstances.

*Id.* at 472, 31 A.3d 922. Thus, the Court concluded that the jury instruction was improper because it "relieved the State of its burden to prove Stabb was guilty beyond a reasonable doubt, invaded the province of the jury, and, thus, violated Stabb's constitutional right to a fair trial."

The *Stabb* Court concluded by noting that, given the inconclusive state of the scholarly research as to the existence of a CSI effect, to "the extent that such an [anti-CSI effect] instruction is requested, its use ought to be confined to situations where it responds to correction of a pre-existing overreaching by the defense, *i.e.,* a curative instruction." *Id.* at 472–473, 31 A.3d 922.

In the case at bar, we conclude that the instruction in question does not come within the need for a curative instruction to cure a defense argument that distorted the law or was overreaching, as explained in *Stabb.* Thus, we turn to the State's primary contention, *i.e.,* the *Atkins* and *Stabb* holdings do not apply to cases, such as this one, which were tried before those cases were decided.

Neither *Atkins* nor *Stabb* expressly addressed how their holdings are to be applied to other cases. As a result, we shall explore relevant case law addressing prospective/retrospective application of appellate decisions. Preliminarily, we note that one of the difficulties in this area is that courts use the terms "prospective" and "retrospective," or their variants, to mean different things. On occasion, courts add "fully" or "entirely" in front of the term being used when they want to change the meaning of the modified word. The difficulty in understanding a particular opinion is sometimes magnified by the lack of detail so as to be able to determine the meaning of the terms used.

There may be permutations, but in general, the possibilities for prospective/retrospective application are (1) application to all cases including those finally litigated at the time of the decision in question and all subsequent cases; (2) application to the facts in the decision in question and to all cases pending on direct review in which the issue was preserved; (3) applica-

tion to the facts in the decision in question and to cases already tried by the time of the decision in question; (4) application to the facts in the decision in question and to cases not yet tried at the time of the decision in question; and (5) application to the facts in the decision in question and to causes of action/criminal conduct arising after the decision in question.

As reflected in the discussion later in this opinion, it appears, generally speaking, the Supreme Court uses the term "retroactive" when it applies an announced principle to cases pending on direct review, and not to convictions which were final at the time of the announcement, whereas the Court of Appeals uses the term "prospective" to mean the same thing.

There are many Supreme Court decisions addressing the prospective/retrospective application of non common law changes in the criminal law area. They are sometimes unclear and sometimes inconsistent. We shall review a few pertinent cases, ending with *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the most relevant for our purposes, followed by a review of current Maryland appellate cases.

Under the common law, a court was "sworn to determine according to the known laws and customs of the land, not delegated to pronounce a new law, but to maintain and expound the old one." 1 WILLIAM BLACKSTONE, COMMENTARIES *69 (15th ed. 1809). The Supreme Court examined this proposition in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) to conclude that "[a]t common law there was no authority for the proposition that judicial decisions made law only for the future." *Id.* at 622–623, 85 S.Ct. 1731. The *Linkletter* Court also examined its earlier decision, *United States v. Schooner Peggy*, 1 Cranch 103, 2 L.Ed. 49 (1801), and explained that it

'is in the general true that the province of an appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes

and positively changes the rule which governs, the law must be obeyed, or its obligation denied . . . [and] where individual rights . . . are sacrificed for national purposes . . . the court must decide according to existing laws, and if it be necessary to set aside a judgment . . . which cannot be affirmed but in violation of law, the judgment must be set aside.'

*Linkletter* at 626, 85 S.Ct. 1731 (quoting *Schooner Peggy*, 1 Cranch at 110). Subsequent to *Schooner Peggy*, the Supreme Court applied the same approach in instances in which a statutory change occurred, a constitutional amendment was adopted, and a judicial decision altered or overruled earlier case law. *Id.* (citing *Carpenter v. Wabash R. Co.*, 309 U.S. 23, 60 S.Ct. 416, 84 L.Ed. 558 (1940); *United States v. Chambers*, 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763 (1934); *Vandenbark v. Owens–Illinois Glass Co.*, 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941)).

■ *Linkletter* discussed the extent to which the holding in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which announced that the exclusionary rule based upon a violation of the Fourth Amendment applied to the states, should be applied retrospectively. The issue was whether it should be applied to convictions that were final prior to the holding. As the *Linkletter* Court explained,

we must consider the term 'retrospective' for the purposes of our opinion. A ruling which is purely prospective does not even apply to the parties before the court. However, we are not here concerned with pure prospectivity since we applied the rule announced in *Mapp* to reverse Miss Mapp's conviction. That decision has also been applied to cases still pending on direct review at the time it was rendered [*e.g., Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) ]. Therefore, in this case, we are concerned only with whether the exclusionary principle annunciated in *Mapp* applies to state court convictions which had become final before rendition of our opinion.

*Linkletter,* 381 U.S. at 621–622, 85 S.Ct. 1731. (Internal citations and footnotes omitted). The *Linkletter* Court defined final as "where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before [the] decision in *Mapp v. Ohio." Linkletter* at 622, fn. 5, 85 S.Ct. 1731.

Based on its review of its prior cases, the Supreme Court stated that a change in law would be given effect to cases pending on direct review, but with certain exceptions, concluded that there were no set principles as to when the change would be given effect to cases in which convictions were final prior to the change in law. *Id.* at 627, 85 S.Ct. 1731. The exceptions were when the new law affected the integrity of the fact finding process, *id.* at 639, 85 S.Ct. 1731, or when a trial or punishment was constitutionally barred. *Id.* at 628, 85 S.Ct. 1731. Aside from the exceptions, with respect to application of the new law to cases with preexisting final convictions, the Court stated that the issue should be decided on a case by case basis, considering the law's purpose and effect, the extent of reliance on the old law, and the effect on the administration of justice of a full retrospective operation. *Id.* at 636, 85 S.Ct. 1731.

The *Linkletter* Court applied the balancing test to its *Mapp* decision, noting that "the fairness of the trial [was not under attack]." *Id.* at 639, 636, 85 S.Ct. 1731. The Court ultimately held that *Mapp v. Ohio* was not to be applied retrospectively to cases already final on direct review with preexisting final convictions. *Id.* at 639–640, 85 S.Ct. 1731.

In *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the Court determined "whether *Escobedo* [*v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)] and *Miranda* [*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] shall affect cases still on direct appeal when they were decided or whether their application shall commence with trials begun after the decisions were announced." *Johnson,* 384 U.S. at 732, 86 S.Ct. 1772. The Court applied the three part balancing test from *Linkletter*

both to convictions that were final and to convictions pending on direct review. *Johnson* at 727–732, 86 S.Ct. 1772. It also noted that "the question whether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree." *Id.* at 728–729, 86 S.Ct. 1772. There, the Court concluded "that *Escobedo* and *Miranda* should apply only to cases commenced after those decisions were announced." *Id.* at 733, 86 S.Ct. 1772. The Court utilized the same approach in *Stovall v. Denno,* 388 U.S. 293, 297, 300, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (in applying the three pronged balancing test, no distinction is justified between convictions that are final and convictions on direct review).

In *United States v. Johnson,* 457 U.S. 537, 563, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), for purposes of prospective/retrospective analysis, the Supreme Court shifted course and distinguished convictions that are final from those that are not final at the time of a change in law. On direct review, the Court had before it the question of prospective/retrospective application of its decision in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton,* the Court had held that the Fourth Amendment prohibits police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest. Specifically, the question before the *Johnson* Court was whether *Payton* applied to an arrest that occurred prior to the decision in *Payton.* The *Johnson* Court held that all decisions construing the Fourth Amendment applied to all convictions not yet final at the time of the decision. *Id.* at 556, 562, 102 S.Ct. 2579. In doing so, the Court recognized that, before its decision in *Johnson,* a decision of the Court applied to final convictions when the decision merely applied settled precedent to different factual situations and when the new ruling was that a court lacked authority to convict or punish a defendant. The Court also recognized that, under its prior cases, a change that constituted a "clear break" from past precedent was "nonretroactive," meaning that it applied to conduct occurring after the change. (citing *Desist v. United States,* 394 U.S. 244, 248, 89 S.Ct.

1030, 22 L.Ed.2d 248 (1969) and *United States v. Peltier*, 422 U.S. 531, 547, n. 5, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).) *Id.* at 549–50, 102 S.Ct. 2579.[3]

In *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Court had before it the question of retroactivity with respect to the holding in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), i.e., a prosecutor's use of peremptory challenges to strike members of a defendant's race from a jury could violate the equal protection clause of the Fourteenth Amendment. In *Griffith*, the defendant's case was pending on direct review at the time of the *Batson* decision. *Griffith*, 479 U.S. at 318, 107 S.Ct. 708. The Court addressed the "clear break" exception discussed in *Johnson*. The Court rejected the *Linkletter* standard for cases pending on direct review at the time of the change in law and held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 328, 107 S.Ct. 708. Thus, *Batson* was to be applied in that manner. Note that the Supreme Court referred to this result as a retroactive application.

In 1975, in *Wiggins v. State*, 275 Md. 689, 344 A.2d 80 (1975), the Court of Appeals examined and synthesized the state of the law governing retrospective application. There, the Court

> glean[ed] from the Supreme Court cases that there are three circumstances in which a retrospective application is mandated, (1) where the old rule affected the integrity of the fact-finding process, (2) where no trial was constitutionally permissible, and (3) where the punishment is not consti-

---

**3.** In *Shea v. Louisiana*, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), the Supreme Court extended the *Johnson* analysis to the Fifth Amendment rule announced in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and held that, while it did not apply to final convictions, it applied to cases pending on direct review.

tutionally permissible. In the absence of one of those three circumstances, then the three-pronged *Linkletter* test is applicable.

*Id.* at 701, 344 A.2d 80. In *Wiggins,* the issue was whether a change in law should be applied to a conviction that was final prior to the change, and "retrospective" was used to denote application of a change to final convictions.

Several years later, the Court explained further that where "the purpose of the new ruling is not concerned with the ultimate fact-finding determination of whether the accused did or did not commit the act he is said to have committed ... the new ruling is usually limited to subsequent cases." *State v. Hicks,* 285 Md. 310, 337, 403 A.2d 356 (1979) (quotations and citations omitted). The *Hicks* decision concluded that mandatory dismissal of criminal charges for non-compliance with Maryland Rule 746 was to be applied "only to future criminal prosecutions and only to those pending cases where, as of our mandate in this case, there have been no appearances of counsel or first appearances of defendants pursuant to Rule 723." *Id.* at 338, 403 A.2d 356.

In *American Trucking Assos. v. Goldstein,* 312 Md. 583, 541 A.2d 955 (1988), the Court stated that

> when, under *Linkletter v. Walker, Wiggins v. State,* and *State v. Hicks,* a new interpretation of a constitutional or legislative provision is to be given only prospective effect, a question arises as to what is meant by "prospective." Generally, in these cases, a "prospective application" of a new interpretation of a constitutional provision, statute, or rule, has included the case before us and all other pending cases where the relevant question has been preserved for appellate review.

*Id.* at 592, 541 A.2d 955 (citations omitted). The Court also noted that when a decision applies a settled rule of law to a new factual situation, no issue of prospective/retroactive analysis arises. *Id.* at 591, 541 A.2d 955.

■ Note that the *American Trucking Assos.* Court referred to the result as a prospective application. In *State v.*

*Daughtry,* 419 Md. 35, 78 fn. 26, 18 A.3d 60 (2011), the Court reiterated this definition of prospective. In neither decision did the Court cite *Griffith v. Kentucky* but the result is consistent with *Griffith,* even though the Supreme Court uses the term retroactive to describe the result, and the Court of Appeals uses the term prospective to describe the result. The consistency with *Griffith* was recognized by the Court of Appeals in *Parker v. State,* 402 Md. 372, 396–97, 936 A.2d 862 (2007) and *Denisyuk v. State,* 422 Md. 462, 471 fn. 5 (2011), the latter an appeal from a post conviction proceeding. The *Parker* Court, pointing out that the issue had been preserved in *Griffith,* stated that the general rule, *i.e.,* a non common law change is applicable to cases pending on appeal at the time of the announcement, is limited to cases in which the issue was preserved. 402 Md. at 396–97, 936 A.2d 862.[4]

Thus, under current Maryland law, the question of whether a new constitutional or statutory decision in the criminal law area should be applied prospectively or retroactively arises only when the decision declares a new principle of law, as distinguished from applying settled principles to new facts. If it does not declare a new principle, it is fully retroactive and applies to all cases. *Denisyuk,* 422 Md. at 478–79, 30 A.3d 914. A new constitutional or statutory ruling, in the criminal law context, ordinarily applies to the facts in the case announcing the change and those cases pending on direct review in which the issue was preserved. A new constitutional or statutory decision will also be fully retroactive, i.e., apply to convictions which were final, when the change affected the integrity of the fact finding process or the change involved the ability to try a defendant or impose punishment.

We conclude that the *Atkins* and *Stabb* holdings apply to the case before us. There was no final judgment at the time of the *Atkins* and *Stabb* decisions, and the issue is

---

4. Unlike a constitutional or statutory change, a change in common law ordinarily is fully prospective except for the parties before the court. *American Trucking Assos.,* 312 Md. at 592, fn. 7, 541 A.2d 955.

preserved. First, as noted above, the decisions were constitutionally based. They did not announce changes in Maryland common law and, thus, are not of the type to be applied only "to the instant case and to all criminal trials commencing and trial in progress on or after the date this opinion is filed." *Ruffin v. State*, 394 Md. 355, 373 fn. 7, 906 A.2d 360 (2006) (citations omitted).

Second, it is not clear that a retroactivity analysis is implicated. The *Atkins* and *Stabb* holdings are clearly based on constitutional principles, *Atkins*, 421 Md. at 443, *Stabb*, 423 Md. at 472, but we read the decisions not as creating new constitutionally based principles but rather as applying settled federal and State constitutional guarantees to "new and different factual situations." *Potts v. State*, 300 Md. 567, 577, 479 A.2d 1335 (1984). The Court of Appeals did not overrule our decision in *Evans;* it clarified and distinguished it. In such a case, "the decision always applies retroactively." *Id.*

Third, if *Atkins* and *Stabb* did contain new constitutional principles, the decisions come within the general rule and apply to all cases pending on direct review in which the issue was preserved.

Because the case before us is on direct review, we need not decide whether *Atkins* and *Stabb* apply to collateral review, i.e., to cases in which convictions were final prior to the decisions. We note the following, however. In *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Supreme Court discussed at length the question of prospective/retrospective application of new rules of constitutional procedure on collateral review of convictions. After reviewing *Linkletter* and several subsequently decided cases, the court adopted the view that new constitutional rules of criminal procedure are not applicable to final convictions with two exceptions: (1) if the rule places "certain kinds of privacy, private individual conduct beyond the power of the criminal law-making authority to proscribe" (quoting a dissenting opinion in *Mackey v. United States*, 401 U.S. 667, 692, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971)) and (2) if the rule implicates

fundamental fairness of the trial. *Id.* at 310–12, 109 S.Ct. 1060.

In *Denisyuk,* a post conviction appeal, the Court of Appeals concluded that the Supreme Court's decision in *Padilla v. Kentucky,* —— U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), that defense counsel is constitutionally ineffective by failing to advise a criminal defendant that deportation is a likely consequence of a guilty pleas, applied settled principles to new factual situations, and thus, it applied to convictions that were final. 422 Md. at 481–82, 30 A.3d 914. The Court also noted that it was not required to follow the *Teague* approach, 422 Md. at 480 fn. 8, 30 A.3d 914, and even if the Supreme Court later decided that *Padilla* was not fully retroactive, it would not affect Maryland law. The *Denisyuk* analysis and result appears to be applicable to *Atkins* and *Stabb.*

Having determined that *Atkins* and *Stabb* control this case, we find no merit to the State's contention that the erroneous instruction was harmless. We cannot conclude beyond a reasonable doubt that the instruction did not influence the verdict. As a result, we shall reverse appellant's convictions.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**