REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2451

September Term, 2013

_____

JACOB BIRCHER

v.

STATE OF MARYLAND

_____

Zarnoch,
Wright,
Nazarian,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  February 2, 2015

Jacob Bircher appeals his conviction by a jury in the Circuit Court for Carroll County of first-degree murder, attempted first-degree murder, and related offenses. He raises three points of error on appeal: *first*, that a supplemental jury instruction improperly introduced the concept of transferred intent into the case; *second*, that the trial court erred in declining to instruct the jury about voluntary surrender; and *third*, that the evidence was insufficient to convict him of any specific intent crimes because he was intoxicated. We agree that the court erred in giving the jury a supplemental transferred intent instruction after closing arguments, and we reverse his convictions for first-degree murder and attempted first-degree murder. We affirm in all other respects, and remand for further proceedings.

## I. BACKGROUND

On July 13, 2012, a shooting outside the Cheers Lounge in Eldersburg left David Garrett dead and Gary Hale with a gunshot wound in his arm. Often in a case like this, a defendant chooses not to testify, leaving us to construct a story based on the tapestry woven by witness testimony. In this case, however, Mr. Bircher did testify and did not dispute that he was the shooter, so we tell the story from his perspective first.

### 1. Trial testimony

Mr. Bircher grew up in Washington State, but moved to Maryland in spring of 2012 to be with his girlfriend, Lily Kerouac. He had the impression that the area he was moving to with her was "not a good area," and their apartment was run-down—he described it at trial as "like a jail." Although he had no experience with handguns, he decided to buy one

for protection. (Other than his car getting keyed on a few occasions, though, Mr. Bircher never experienced any threats or danger while living in the neighborhood.)

After they struggled to find work in Maryland, Ms. Kerouac told her parents that she and Mr. Bircher were contemplating a return to Washington, a situation that left him frustrated after moving all the way here. Because Ms. Kerouac attended school and ultimately did find work, Mr. Bircher often found himself alone in their apartment, where he experienced mounting loneliness and financial anxieties, and he began drinking.

On the day of the shooting, Mr. Bircher "got bored" and started watching videos about taking his gun apart. He also began drinking, and had consumed about six drinks at home by late that afternoon. He and Ms. Kerouac had an argument when she came home from work, so he left—making a fateful decision to take the gun with him—and drove around town, as he often did after the two fought, in order to "cool off." He stopped at Cheers, and over the next several hours had several more drinks, spending much of his time outside the front of the bar where people were hanging out and smoking. He admitted that he was drunk and annoying the other customers.

Mr. Bircher met Kristen Remmers and her friend Melinda Thurston inside the bar, and the group began sharing drinks and talking. Mr. Bircher left the bar again for a cigarette, and Mr. Hale came outside with Ms. Remmers. He remarked to her about Mr. Bircher (who had only met Ms. Remmers that night, but with whom she admitted she had been flirting) that "your little boyfriend is about to get his ass beat." Mr. Bircher, ostensibly fearing for his safety, went to his car; after realizing he left his credit card in the bar, though,

2

he decided to go reclaim it and took the gun with him. He testified at trial that as he headed back to the bar, the group that included Ms. Remmers and Mr. Hale came toward him, and he was scared that he "was going to get seriously beaten to death, maybe even die." He explained what happened next:

> I just reacted really fast and just like a split second decision and I pulled the gun out *and I just started firing in between people.* There is [sic] lots of different groups of people and I just aimed the gun in like an open area to the right of the main group. And tried to stay away from people that were over here and I just fired the gun as fast as I could to try to make as much noise as possible. Tried to scare everybody away from me so that I could just get away and go back to my car.

(Emphasis added.) He reiterated that his intention was "[j]ust to scare everybody away." After the shooting, Mr. Bircher became hysterical; he returned to Ms. Kerouac's parents' house and decided to remain there to "sober up," and turned himself in to police the next day.

The State called a total of twenty-five witnesses in its case-in-chief. Mr. Hale testified that he warned Ms. Remmers (within earshot of Mr. Bircher) to stay away from Mr. Bircher, and heard the two of them yelling. He could tell Mr. Bircher was drunk, and he lingered outside of Cheers drinking and trying to get cigarettes from other patrons. Mr. Hale gave his impression of the shooting in a prior recorded statement, speculating that "something must have happened" that caused Mr. Bircher to react as he did, but he saw nothing that would have caused the shooting. He could not tell if Mr. Bircher was aiming at anyone in particular, but he did not think so given that the shots came in rapid succession.

3

Ms. Remmers testified about meeting Mr. Bircher that night, sharing drinks, and flirting with him. She saw Mr. Bircher taking people's drinks inside the bar and watched people become upset with him. As she left the bar later that evening, she heard popping sounds, and saw Mr. Garrett get struck in the head. She said at trial she thought Mr. Bircher was "F'd up on something" because of his slurred speech and the unusual appearance of his eyes.

Other witnesses corroborated Mr. Bircher's annoying behavior at the bar and his drunkenness (and indeed incomprehensibility), both of which seemed to foreshadow a confrontation outside with a group (the group into which Mr. Bircher ultimately fired) of about ten people. At least one witness testified that Mr. Bircher "was shooting aimlessly," and that although she could not tell if Mr. Bircher was directing the gun at anyone, she felt that the gunfire simply hit whoever happened to be there. Another witness echoed this sentiment, saying he was not sure "what or who the suspect was pointing the gun at," and yet another characterized Mr. Bircher as "kind of shooting wildly."[1]

The defense offered testimony about Mr. Bircher's predisposition to depression and alcohol abuse and his family history of mental illness. Mr. Bircher's expert opined that he suffered from six different mental disorders and that his illness was consistent with a belief that he was in real danger under the circumstances, and that he effectively acted in self-

---

[1] Also, Trooper James Lantz testified that he responded to the 911 calls from Cheers, secured the scene, and found thirteen spent shell casings on the ground.

4

defense. The State presented its own expert in rebuttal, who added a diagnosis of anti-social personality to the mix and opined that Mr. Bircher was able to make intelligent decisions, weigh the pros and cons before acting, and appreciate the consequences of his actions.

## 2. Closing arguments

Mr. Bircher conceded that he was the gunman, but he and the State disagreed about what he meant to accomplish as he pulled the trigger. During closing arguments, the parties continued to spar over the question of intent. Making the case for first-degree murder, the prosecutor argued that the act of pointing a gun and firing thirteen shots *into a crowd* demonstrated a willful intent to kill:

> First Degree Murder. The elements of that charge are that the Defendant caused the death of David Garrett and that the killing was willful, deliberate and premeditated.
>
> *Willful means that the Defendant actually intended to kill.* Deliberate, the Defendant was conscious of the intent to kill. Premeditated, that the Defendant thought about the killing. That he had enough time to consider the decision whether or not to kill. And that the Defendant had enough time to weigh the reasons for and against the choice to kill . . . David Garrett [who] is the victim for that charge.
>
> And the evidence, the evidence in regards to the willful aspect of First Degree Murder. Well, quite simply the Defendant could have left the [gun] in his car. But he did not. Instead he walks from the bar to the far end of the parking lot, went to his car and we know he sat in his car for a moment and retrieved that Glock 23. That Glock 23 had the sight zeroed for accuracy.
>
> The Defendant said he took the Glock 23 because it gave him confidence and he concealed that Glock 23 in his [waistband] and/or his pocket prior to the killing. He did not walk up to the crowd so that they could see his gun. He had it concealed. *And*

5

*when he pulled that gun out there was no hesitation in him pulling the trigger. He pointed at the people outside the bar.*

\* \* \*

Evidence of premeditation. That Glock was fully loaded with ammunition. . . . There was nothing obstructing his line of fire. He had a clear and open shot. He did not hide behind a car or anything like that. He stood right out there in the open. *He walked right up near the front door, where as you heard most people hang out. He immediately fired.* There was no hesitation. He knew what he wanted to do.

\* \* \*

Evidence of the deliberate aspect of First Degree Murder. Well, *the projectiles were recovered from the sand bucket and the frame of the door. And we know from testimony that that is the area where most of the people were standing.* You have projectiles recovered from Mr. Hale and Mr. Garrett, the victims.

\* \* \*

Intent. Now, the jury instruction indicates that the Defendant's intent may be shown by the surrounding circumstances. As you have heard no one can get into the Defendant's mind on the day that this happened. So, what we look at, is we look at the surrounding circumstances. We look at the Defendant's acts, the Defendant's statements and the surrounding circumstances around this crime.

*In regards to the Defendant's acts, he aimed and fired that 40 caliber Glock 23 at the crowd of people. He fired the entire magazine. His intention was clear. And that was to kill.*

(Emphasis added.) The defense, not surprisingly, painted an altogether different picture.

Counsel for Mr. Bircher argued that he lacked generally the intent to shoot anyone, and

lacked the specific intent to shoot Mr. Garrett:

6

Mr. David Garrett is truly, truly an innocent victim. Mr. Hale, we will talk about. Mr. Garrett did nothing except walk out the door. And when the State tells you that this was premeditated, deliberate with the specific intent to kill David Garrett, you do something for a reason. *There was no reason that Mr. Bircher had to shoot at Mr. Garrett and he did not intend to shoot at Mr. Garrett and he did not intend to kill Mr. Garrett.*

And the evidence of the injuries to Mr. Garrett, on the right hand side, are consistent with him having walked out the side of the door and basically gotten caught in the volley.

(Emphasis added.)

The defense returned later to the suggestion that if Mr. Bircher did not intend *specifically* to kill Mr. Garrett, he could not be guilty of first-degree murder:

First Degree, *it is out of the picture.* David Garrett walks out the door, as I said. *There is no intent to kill David Garrett because David Garrett is a non-entity to Mr. Bircher.* He is the wrong [guy] in the wrong place. *And things happen too quickly for Mr. Bircher* to be in anyway held accountable—I should not say held accountable—*to have had the time and intent to kill Mr. Garrett.*

(Emphasis added.) He followed up again with this idea at the end of his remarks, asking, "Did he have no reason to have animosity to shoot David Garrett? If so, he could not have intended premeditated and deliberated to kill him."

According to the State on appeal, "[t]he above statement is an incorrect statement of law." The State claims that it was not required to prove the identity of the defendant's victim, and it took that position on rebuttal in closing:

And it was a good question [defense counsel] brought up. Who is the Defendant trying to kill outside of Cheers? From the State's theory and the State's belief and the evidence, *he was*

7

*trying to kill everybody out there. You empty a clip into a crowd of people, you are trying to kill everybody in that kill zone and that [] is exactly what the Defendant did.* And that is why the Defendant is guilty of First Degree Murder, Attempted First Degree Murder and all related charges.

(Emphasis added.)

### 3. The jury note and supplemental instruction

The parties' conflicting beliefs about what constitutes first-degree murder as a legal matter led to confusion on the jury's part. It submitted a note during deliberations: "We are confused on the term 'intent.' Does it mean to kill a person or the *specific* person? Can you please clarify. Thank you." (Emphasis in original.)

The State, conceding that it had not initially requested an instruction on transferred intent, nevertheless asked that the court instruct the jury on transferred intent. Counsel for Mr. Bircher objected, arguing that transferred intent had not been an issue in the case, and to instruct the jury about it at that point would introduce a new theory of liability. Specifically, counsel explained that the defense focused in closing on Mr. Bircher's "lack of animosity" toward Mr. Garrett, and that the defense strategy "would not have put the emphasis on the lack of intent to kill David Garrett as a fact that was—the lack of motive or reason to kill David Garrett in the same way that we did." He clarified later that until the State's rebuttal, the defense was "operating . . . on the theory that there was an intent to kill David Garrett and an attempted [sic] to kill Gary Hale, but not this shooting up and killing anybody who happened to be in the territory kind of a theory."

8

The court decided to give a supplemental instruction on transferred intent and gave defense counsel the chance to supplement his closing argument. After he requested the evening to prepare supplemental remarks (the colloquy with the court took place around 4:00 in the afternoon), the court asked the jury whether it preferred to deliberate without an answer or break for the night. The jury sent a note back: "We are unable to proceed without Supplemental Instructions. *We have reached agreement on all counts but one.* Thank you. (We could reach agreement in just a few minutes with the Supplemental Instructions.)" (Emphasis added.)

The court instructed the jury the next morning:

> Defendant is charged with murder, with the murder of David Garrett. One element of this offense is the requirement of intent. Based on the Doctrine of Transferred Intent, intent is present if a person attempted to kill one person and as a result of that act accidentally or mistakenly killed another person, such as a bystander or a third person. Under the Doctrine of Transferred Intent the intent is transferred from the intended victim to the unintended victim.

> If after a full and fair consideration of all of the facts and circumstances in evidence, if the State proves beyond a reasonable doubt that the Defendant attempted to kill another person and as a result of that act instead accidentally or mistakenly killed David Garrett the Defendant is deemed to have intended to kill David Garrett.

Counsel for Mr. Bircher then offered additional argument after objecting to the supplemental instruction altogether. Counsel claimed that Mr. Bircher had been irreparably prejudiced by the instruction, and no argument could cure it.

9

## 4. The verdict

The jury found Mr. Bircher guilty of first-degree murder of David Garrett, attempted first-degree murder and first- and second-degree assault of Gary Hale, use of a handgun in the commission of a crime of violence and carrying a handgun with the intent to injure (as to both Mr. Hale and Mr. Garrett), first- and second-degree assault of Gary Hale, transportation of a handgun in a vehicle, and reckless endangerment.

## II. DISCUSSION

The parties frame the main issue on appeal here[2]—the supplemental instruction about transferred intent—in terms of whether a supplemental jury instruction was appropriate, *i.e.*, whether the instruction improperly injected a "new theory of culpability" for the first time. That's not quite the right question. The doctrine of transferred intent wasn't *new* in that it required a change in strategy on the part of the defense—it never applied in the first place and never fit the State's theory of the case. When the trial court gave the supplemental instruction on transferred intent, it didn't clarify matters for the jury,

---

[2] Mr. Bircher raises three issues total on appeal:

1. Did the trial court abuse its discretion in giving a supplemental instruction on transferred intent?
2. Did the trial court abuse its discretion in failing to give Appellant's requested jury instruction on voluntary surrender?
3. Was the evidence legally sufficient to convict Appellant of the specific intent crimes?

but created a new source of confusion. That said, Mr. Bircher's other challenges withstand scrutiny.

### A. The Trial Court Improperly Gave A Supplemental Instruction On Transferred Intent.

Mr. Bircher contends that the trial court improperly allowed the supplemental instruction, because it introduced a "'new theory of culpability,'" (quoting *Cruz v. State*, 407 Md. 202, 222 (2009)), that Mr. Bircher's counsel had not had a chance to address during closing argument. He argues that the theory of transferred intent played no part in the trial until after the jury note came in: "[I]t is clear from the record that the State never attempted to set forth a theory based on transferred intent at any point in trial."

The State responds that introducing the doctrine of transferred intent did not undercut Mr. Bircher's ability to defend himself. According to the State, the jury "had conflicting information regarding the requisite intent for first-degree murder," so a supplemental instruction was necessary: Mr. Bircher's own counsel told the jury it must find that he intended to kill David Garrett if he was to be convicted of first-degree murder, and the State argued at trial that Mr. Bircher could be convicted of first-degree murder if the jury found he intended to kill "all of the people outside Cheers, regardless of their identity, and the confusion required clarification."

A trial court may issue supplemental instructions under Maryland Rule 4-325(a):

> The court shall give instructions to the jury at the conclusion of all the evidence and before closing arguments and *may supplement them at a later time when appropriate.* In its

11

discretion the court may also give opening and interim instructions.

(Emphasis added.) Subpart (c) of the Rule circumscribes the court's authority:

> The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

We review the trial court's decisions regarding jury instructions for abuse of discretion. *Crispino v. State*, 417 Md. 31, 41 (2010); *Brogden v. State*, 384 Md. 631, 640-41 (2005). The Court of Appeals explained in *State v. Baby*, 404 Md. 220 (2008), that a supplemental instruction must *clear up* any potential confusion:

> In *Lovell* [*v. State*, 347 Md. 623 (1997)], we held that a trial court must respond to a question from a deliberating jury in a way that *clarifies the confusion evidenced by the query* when the question involves an issue central to the case. We concluded that the trial court abused its discretion in a capital case when it refused to provide further guidance on the term "youthful age" when youthful age was a statutory mitigating circumstance. *Id.* at 660. In reaching our holding, we cited *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946), in which Justice Frankfurter, writing for the Court, stated that when "*a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy*," as well as to *Price v. Glosson Motor Lines, Inc.*, 509 F.2d 1033, 1037 (4th Cir. 1975), for the proposition that when "a jury makes a specific difficulty known . . . and when the difficulty involved is an issue . . . central to the case . . . helpful response is mandatory." *Lovell*, 347 Md. at 658-59.

*Baby*, 404 Md. at 263 (emphasis added).

We see the problem differently than the parties do. The jury's question actually struck on a point of confusion that, oddly enough, no one had actually identified: whether

12

someone who fires into a crowd of people, not aiming at anyone in particular, can be found to have formed a specific intent to kill that would permit a jury to find him guilty of first-degree murder.[3] Although that question was not really argued below (and is not before us now), that is the question that the trial court should have sought to clear up with a supplemental instruction. The parties, looking at the supplemental instruction that the trial judge actually gave, frame the argument around *Cruz*, in which, to be sure, the Court of Appeals analyzed the rule that the trial court cannot instruct a jury on a "new theory of culpability . . . after closing arguments [were] completed." 407 Md. at 222. But a quick look at *Cruz* demonstrates that this case falls nowhere within the rule.

Mr. Cruz was charged with first-degree assault, and a victim testified that Mr. Cruz approached him swinging a baseball bat; he jumped out of the way to avoid getting hit, slipped on snow, and fell down, and then Mr. Cruz hit him with the baseball bat. *Id.* at 205. Another witness testified on behalf of the defense, however, that the victim fell down during the chase, and that Mr. Cruz did not hit him with the bat.

---

[3] It is not clear whether Mr. Bircher's counsel was trying to argue during closing that the jury must conclude Mr. Bircher intended to kill Mr. Garrett *knowing that he was Mr. Garrett*, or that it must conclude Mr. Bircher intended to kill the individual who ended up being Mr. Garrett by aiming specifically at him. We agree with the State that there is a third scenario: when one shoots into a crowd with the "lack of focus on a specific victim," *see State v. Mitchell*, 894 So.2d 1240, 1249 (La. Ct. App. 2005), the question arises whether that individual can be found guilty of a crime that has the specific intent to kill as one of its elements. That is the question the jury really asked here, and the supplemental instruction did not answer it. Counsel and this Court discussed the question at oral argument, but it was not briefed or sharpened as a separate issue on appeal.

The court instructed the jury on second-degree assault, and the jury asked a question during deliberations: "'[I]s Y falling on a sidewalk & hitting head while being chased by a bat by X, an assault by X on Y?'" *Id.* at 207. The court gave a second instruction defining assault, but characterized the offense as an attempted battery—a different variety of second-degree assault—rather than intentional second-degree assault. The jury ultimately found Mr. Cruz guilty of second-degree assault. He appealed, arguing that the supplemental instruction improperly instructed the jury on "the attempted battery version of assault," rather than the crime of second-degree assault that had been argued at trial. The Court of Appeals agreed, explaining that injecting a different type of assault through a supplemental instruction required that Mr. Cruz's counsel to shift theories:

> Had [Mr.] Cruz known that the jury would be instructed on this assault theory, *his counsel would likely not have hinged his defense on the contact element of battery* and, instead, would have emphasized that [Mr.] Cruz never intended to bring about harmful physical contact when he grabbed the bat and chased [the victim.]

*Id.* at 221. Counsel had effectively conceded at trial that Cruz intentionally went after his victim (just that he had then missed him), and likely would not have made that election if the State had adopted attempted battery as its theory throughout. *See Cruz*, 407 Md. at 221.

The cases that *Cruz* discussed all stood for the proposition that "trial courts 'must respond to a question from a deliberating jury in a way that clarifies the confusion evidenced by the query when the question involves an issue central to the case.'" *Id.* at 210 (quoting *Baby*, 404 Md. at 263). By the same token, a supplemental instruction that brings in "conceptually different theories," *id.* at 213 (quoting *United States v. Gaskins*,

14

849 F.2d 454, 458 (9th Cir. 1988)), causes prejudice because "'a defendant must have an adequate opportunity to argue his innocence under the [trial] court's instructions in order to be assured a fair trial.'" *Id.* at 214 (quoting *United States v. Horton*, 921 F.2d 540, 544 (4th Cir. 1990)).

This case is a step removed from *Cruz* and its predecessors. Transferred intent was not *central* to this case—it had no place at Mr. Bircher's trial to begin with. It also doesn't quite fit *Cruz's* admonition that "a supplemental instruction is not appropriate under Md. Rule 4-325 if given in response to a question that has 'absolutely nothing to do with the case as presented to that jury.'" *Id.* at 211 (quoting *Brogden*, 384 Md. at 644 (emphasis omitted)). The *question* had everything to do with the case, but the *answer* had nothing to do with it. Instead, the instruction that the court read engrafted an altogether new, different, and wholly inapplicable theory onto the State's case.

The doctrine of transferred intent transfers a defendant's intent from an *original intended victim* when the impact of the act befalls another, unexpected victim. See 12 M.L.E. Homicide § 7 ("[I]n transferred intent, the intended harm does not occur to the intended victim, but occurs instead to a second unintended victim. The actual result is an unintended, unanticipated consequence of intended harm."). But Maryland cases have required a specific victim at the outset—an intended target—at whom the defendant fires and misses. *See, e.g.*, *Gladden v. State*, 273 Md. 383, 405 (1974) (holding that transferred intent "is the law of Maryland and that the *mens rea* of a defendant *as to his intended victim* will carry over and affix his culpability" when it causes the death of another (emphasis

15

added)); *Pettigrew v. State*, 175 Md. App. 296, 308 (2007) (stating that the doctrine of transferred intent "applies when lethal force is *directed toward an intended victim*, but misses its target and kills an unintended victim" (emphasis added)).

Under the State's theory of the case at trial, there was no originally intended victim. The State did not argue that Mr. Bircher intended to hit a particular victim (so, for example, he was not trying to kill Mr. Hale in a fit of jealousy, accidentally killing Mr. Garrett instead), but instead described his intent in shooting in more diffuse terms: "This case is about the Defendant shooting people outside the Cheers Bar in Eldersburg." Counsel referenced Mr. Bircher shooting "thirteen times *at the crowd right outside the door. . .*" Finally, counsel argued that Mr. Bircher knew what would happen when he shot into the crowd: "when his actions of taking a gun to a bar, putting it on his person, walking over to a crowd of people, putting his arm out, pointing the gun at his human targets, firing thirteen times, the natural and probable consequences of that action is he is going to kill someone and almost killed someone." The State never suggested that any fight between Mr. Hale and Mr. Bircher precipitated the attack that might support a transferred intent theory. In closing argument, counsel for the State reiterated that Mr. Bircher "pointed that Glock at the human targets" (plural) at the bar.[4]

---

[4] Although the State did argue that Mr. Bircher intended to kill Mr. Hale (with respect to the attempted murder charges) and Mr. Garrett (with respect to the murder charges), the prosecutor never argued that Mr. Bircher meant to kill *these two* individuals as opposed to others who found themselves at the scene, just that "[h]e pointed at the *people outside of the bar.*"

Interestingly, the State did raise briefly the suggestion of transferred intent in opposing the motion for judgment at the end of its case. After arguing that Mr. Bircher intended to kill "all of his human targets including David Garrett and Gary Hale[, e]veryone standing by the door," counsel for the State then said, "[s]o the State, in addition, even under first degree murder, there is transferred intent, so even if he was aiming at Gary Hale, and he hit David Garrett, the intent to kill Gary Hale would also transfer over to David Garrett." We see no suggestion in the record beyond that, however, nor has the State pointed to any testimony or argument that came before the jury that brought transferred intent into play.

The supplemental instruction, then, is a square peg that never fit the round hole of the State's theory of the case, and the State concedes as much:

> *Admittedly, the doctrine of transferred intent does not quite fit the facts of this case.* The State was not arguing that Bircher specifically intended to kill John Doe, but killed David Garrett instead. The State was arguing that Bircher intended to kill everyone and anyone who had the misfortune of standing outside Cheers bar at that particular time, despite the fact that he did not know their exact identities.

(Emphasis added.)

Whether the State meant to frame the case with a theory of transferred intent in mind, the supplemental instruction on transferred intent did not fit the case the State in fact tried. We cannot, therefore, agree with the State that an improper jury instruction about

17

transferred intent cured an error or confusion on the part of the jury—to the contrary, the supplemental instruction forced Mr. Bircher to respond after closing to an altogether new theory of intent, and the fact that the jury resolved its impasse so quickly after the supplemental instruction tells us that the instruction mattered to the jury's decision.

This conclusion leaves us to determine which convictions were affected by the erroneous supplemental instruction. Mr. Bircher argues that we must reverse the convictions for all the crimes of which he was found guilty that contain an element of specific intent—*i.e.*, murder and assault—because of the inevitable confusion that the supplemental instruction caused. [5] The State counters that because the jury explained not long after its first request for clarification that it had "reached agreement on all counts but one," we can infer that the jury had already agreed to convict Mr. Bircher on everything *except* the first-degree murder count, and so the remaining convictions should stand.

We decline the invitation to divine which charge remained unresolved in the jury's mind, even though the question the jury asked—"Does [intent] mean to kill a person or the *specific* person?"—does seem to focus on the homicide charges (including, we think, attempted murder). But even read most broadly, the supplemental instruction, and thus the

---

[5] Mr. Bircher's counsel conceded (correctly) at oral argument that only the convictions with respect to specific-intent crimes were affected by the instruction; thus, the handgun charges and the reckless endangerment charge stand. *See Williams v. State*, 100 Md. App. 468, 501 (1994) ("It is undisputed that a specific intent to do harm is not part of the *mens rea* of reckless endangerment.")

range of charges vulnerable to potential confusion, was limited by its very terms to the homicide charges, beginning with the opening sentence:

> *Defendant is charged with murder, with the murder of David Garrett*. One element *of this offense* is the requirement of intent. Based on the Doctrine of Transferred Intent, intent is present if a person *attempted to kill* one person and as a result of that act *accidentally or mistakenly killed* another person, such as a bystander or a third person. Under the Doctrine of Transferred Intent the intent is transferred from the intended victim to the unintended victim.
>
> If after a full and fair consideration of all of the facts and circumstances in evidence, if the State proves beyond a reasonable doubt that the Defendant *attempted to kill* another person and as a result of that act instead *accidentally or mistakenly killed* David Garrett the Defendant is *deemed to have intended to kill* David Garrett.

(Emphasis added).

Moreover, the doctrine of transferred intent could only have applied to the homicide charges in any event. *See Jones v. State*, 213 Md. App. 208, 214 (2013), *aff'd*, 440 Md. 450 (2014) (citing *Pettigrew*, 175 Md. App. at 314-15). So because the supplemental instruction bore only on the jury's analysis of how and whether Mr. Bircher had formed a specific intent to kill, we reverse the convictions for murder and attempted murder, and hold that the instructional error did not affect the convictions for assault.

**B.      The Trial Court Did Not Err When It Declined To Instruct The Jury That Surrender May Be Considered Evidence Of Innocence.**

Mr. Bircher contends *second* that the trial court erred when it declined to instruct the jury that a defendant's decision to surrender voluntarily to police can constitute

19

evidence of innocence.[6] He complains that the trial court instead improperly gave a jury instruction about flight immediately after the commission of a crime.[7] The State cites *Pierce v. State*, 62 Md. App. 453 (1985), and counters that Mr. Bircher's request was adequately covered by the flight instruction. As the State sees it, evidence of voluntary surrender is admitted "only as rebuttal to evidence of flight," and did not require an instruction on voluntary surrender as well. Because this issue could recur on remand, we address it here.

Maryland Rule 4-325(c) addresses how the court instructs the jury:

> The court may, and *at the request of any party shall, instruct the jury as to the applicable law* and the extent to which the

---

[6] Mr. Bircher requested the following instruction:

> A person's decision to voluntarily surrender to law enforcement officials may be considered by you as evidence of innocence. Surrender under these circumstances may be considered by a variety of factors. You must decide if there is evidence of voluntary surrender and then you must decide whether the act of voluntary surrender shows a consciousness of innocence.

[7] The court instructed the jury:

> A person's flight immediately after the commission of a crime or after being accused of committing a crime is not enough by itself to establish guilt. But it is a fact that may be considered by you as evidence of guilt. Flight under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first decide whether there is evidence of flight. If you decide there is evidence of flight you must decide whether this flight shows a consciousness of guilt.

20

> instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. *The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.*

*Id.* (emphasis added).

We review a court's decision about jury instructions for an abuse of discretion, *Atkins v. State*, 421 Md. 434, 446 (2011), and "we will reverse the decision if we find that the defendant's rights were not adequately protected." *Cost v. State*, 417 Md. 360, 368-69 (2010). The Court of Appeals explained in *Atkins* the reason behind the rule, and how far a trial judge must go beyond the bounds, before a reviewing court will reverse a decision about jury instructions:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order of the trial court is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

*Atkins*, 421 Md. at 447 (quoting *Gunning v. State*, 347 Md. 332, 351 (1997)).

The facts in *Pierce* were not all that different from the facts here. Ms. Pierce fatally shot another guest at a party after a struggle. (She carried a handgun for protection after a number of violent crimes took place in her neighborhood.) She fled the scene, but voluntarily surrendered to police the next morning. 62 Md. App. at 456. The trial court gave the State's requested instruction that the jury could infer consciousness of guilt based

on Ms. Pierce's leaving the scene, but the court declined defense counsel's request to instruct the jury about her surrender. *Id.*

We explained in *Pierce* that "[i]n the *normal course of behavior*, flight may reflect an awareness of guilt. Thus, evidence of flight becomes relevant and admissible." *Id.* On the other hand, courts do not admit proof of voluntary surrender because "it is not viewed as unexpected behavior in what appears to be a criminal incident." *Id.* Evidence of surrender becomes admissible to rebut testimony about flight. But the *admissibility* of this evidence is different from the need for a jury instruction about it.

We borrowed in *Pierce* from an Iowa case in which a defendant argued that a flight instruction should have included language referring to the defendant's voluntary return and surrender in the jurisdiction. The Iowa Supreme Court disagreed:

> "[F]inally we believe the court's instruction on flight was adequate; it was not necessary to add the language defendant proposed. Certainly evidence of defendant's voluntary surrender might bear on the inference of guilt arising from evidence of flight. *But the instruction as given accorded the defendant the opportunity to present the explanation he sought to urge upon the jury. This is all that is required.*"

*Pierce*, 62 Md. App. at 457-58 (quoting *State v. Haskins*, 316 N.W.2d 679, 681 (Iowa 1982) (emphasis added)).

Mr. Bircher argues that *Pierce* does not control—he claims that the flight instruction contained no language to suggest that the jury could *not* consider flight as evidence of consciousness of guilt "unless [it was] adequately explained," and that such a caveat should have been included as it was in *Pierce*. He also argues that the instruction here did not

22

instruct the jury to consider evidence of flight "with all the other evidence in the case." This argument fails for two reasons. *First*, Mr. Bircher's interpretation ignores the deferential standard of review we afford the trial court in a situation like this one. *Second*, Mr. Bircher actually got a *better* instruction here than the one in *Pierce*. Here, the court informed the jury that it would have to find evidence of flight *and then* consciousness of guilt and, as the State points out, "[d]efense counsel was free to argue that the jury should not infer a consciousnesss of guilt from [Mr.] Bircher's flight because that would be inconsistent with his voluntary surrender the next morning." We see no abuse of discretion in the circuit court's decision not to add a surrender instruction to the flight instruction it gave.

## C. Mr. Bircher Failed To Preserve His Sufficiency Claim.

Mr. Bircher contends that the evidence was insufficient to convict him of first-degree murder, attempted first-degree murder, and first-degree assault because these crimes require that a defendant form the specific intent to commit them which, according to Mr. Bircher, he could not form because he was too intoxicated. We must address the sufficiency challenge, if only to find it waived, when we reverse or vacate and remand for further proceedings because if we agree with appellant that the evidence was insufficient, the Double Jeopardy Clause to the United States Constitution prohibits a retrial based on the prosecution's failure to present sufficient evidence the first time around. *Winder v. State*, 362 Md. 275, 325 (2001) (citing *Burks v. United States*, 437 U.S. 1, 11 (1978)); *Markham v. State*, 189 Md. App. 140, 169 (2009) ("'[W]hen a defendant's conviction is

23

reversed by an appellate court on the ground that the evidence is insufficient to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge.'" (quoting *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988))).

In this case, we will not address the substance of the sufficiency argument because Mr. Bircher failed to preserve it at trial. The State correctly points out that Mr. Bircher did not, as required by Maryland Rule 4-324, move for judgment of acquittal on this ground. The Rule requires that a defendant "shall state with particularity all reasons why the motion should be granted." Md. Rule 4-324(a); *see also Starr v. State*, 405 Md. 293, 302 (2008). At the close of the State's case, Mr. Bircher's counsel moved for a judgment of acquittal. But although counsel cited the State's "failure to produce legally sufficient evidence," there was no argument that intoxication precluded Mr. Bircher from forming the intent to kill anyone. The court denied this motion, as well as a similar motion made at the close of all the evidence that simply incorporated the prior arguments. Mr. Bircher's failure to raise sufficiency at any point during two separate motions for judgment is fatal to his argument here.

**CONVICTIONS FOR MURDER AND ATTEMPTED MURDER REVERSED; JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AFFIRMED IN ALL OTHER RESPECTS, AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EVENLY BETWEEN THE PARTIES.**